*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0099p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DARRYL GRAY, Personal Representative of Estate of
Mark Gray, Deceased,

> *Plaintiff-Appellant,*

*v.*

CITY OF DETROIT and POLICE OFFICER DOUGLAS
GROSS,

> *Defendants-Appellees.*

No. 03-2515

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-74265—George C. Steeh, District Judge.

Argued: December 10, 2004

Decided and Filed: March 1, 2005

Before: MERRITT, GIBBONS, and ROGERS, Circuit Judges

---

## COUNSEL

**ARGUED:** Jana Holbrook Sibson, Pinckney, Michigan, for Appellant. Joanne D. Stafford, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellee. **ON BRIEF:** Jana Holbrook Sibson, Pinckney, Michigan, for Appellant. Joanne D. Stafford, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellee.

---

## OPINION

---

MERRITT, Circuit Judge. This § 1983 case arises from the suicide of plaintiff's decedent, Mark Gray, while in pre-trial custody. Plaintiff Estate has sued Police Officer Gross for failing to adequately monitor Mr. Gray in his cell and the City of Detroit for failing to train its officers to foresee and prevent jail suicides. We agree with the District Court's conclusion to grant summary judgment in favor of defendants. Officer Gross did not have the requisite knowledge that Gray was suicidal, and the suicide policies of the city, as well as its implementation of these policies, were constitutionally adequate in this case.

1

## I. FACTUAL SUMMARY

Mark Gray was arrested on the evening of July 1, 2000, for breaking into and refusing to leave a rental property owned by Gray's brother, as well as for attempting to hit his brother with a metal pipe. One of the arresting officers testified that he knew Gray was a "mental" who had been arrested before. Officers transported Gray to a holding cell at Detroit's Fifth Precinct.

The following morning Gray appeared agitated; he was "talking loud" and "ranting." This culminated in his destroying some of his holding cell, including ripping the phone from the wall and breaking the sink and toilet. He was then moved to a so-called "suicide" cell at the precinct. Gray had not expressed any suicidal intent and defendants assert that this move was only intended to avoid further destruction of city property. Gray was no longer aggressive after transferring cells, although he did demonstrate "mood swings all day."

Later in the day, as a result of Gray's complaints of chest pains and breathing difficulties, he was moved to one of two police cells in the Detroit Receiving Hospital that were maintained for detainees with medical problems. The transferring officer testified that Gray gave no indication of being suicidal and that no one at the Fifth Precinct notified her that he was suicidal. On his arrival at the hospital he was screened regarding his medical complaints by an intake nurse before being placed in the holding cell.

Defendant Officer Gross was on duty in the Receiving Hospital cells from the time Gray arrived between 5:00 and 6:00 p.m., July 2, until he ultimately committed suicide about 7:30 p.m. the same day. Before Gray's arrival, at about 2:45 p.m., Gross checked the cells and cleared them of unsafe items. When Gray arrived, he was searched and put into leg irons as part of standard procedure. About 6:35 p.m., officers heard Gray banging on his cell door and yelling in an agitated state. In response, Gross and another officer re-entered the cell and handcuffed Gray's hands behind him to restrain his agitated behavior.

At approximately 7:30 p.m. another officer found Gray hanging in his cell by a hospital gown, having slipped his handcuffed hands under his feet to the front of his body. Although the exact source of the gown is unknown, parties speculate that it was either already present in the cell when Gray was placed there and Officer Gross failed to notice it on his 2:45 p.m. inspection or it was brought in later by another detainee or by hospital staff.

There is conflicting evidence regarding when Gray's status was visually checked. The only way to check on a prisoner was to leave the detail room (an entry room for the holding cells) and look directly through his cell door. Officer Gross testified that he did not leave the detail room from the time Gray arrived to the time he was found hanging. This is in conflict with the otherwise undisputed evidence that Officer Gross entered the cell at 6:35 to help handcuff Gray. Also, Gross testified that "I would have checked him at 6:30, 6:45, 7:00, [and] 7:15." Gross remembered viewing Gray at least one time and observed he was "just sitting on the bench, he was calmed down, he wasn't irate any more and he didn't appear to have any problems."

## II. ANALYSIS

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

**A. Officer Gross is Entitled to Qualified Immunity**

This Court has adopted a three step analysis in determining when qualified immunity applies. *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 900-901 (6th Cir. 2004). First, while viewing the facts in the light most favorable to the plaintiff, the Court determines whether a violation of plaintiff's constitutional rights has occurred. *Id.* Second, the Court asks if the violation "involved a clearly established constitutional right of which a reasonable person would have known." *Id.* Third, the Court determines if the plaintiff has offered evidence sufficient to show that the official's conduct was objectively unreasonable in light of the clearly established constitutional right at issue. *Id.* A negative answer to any of the three questions means that the officer is entitled to qualified immunity.

To answer the first question, we must determine what rights a pre-trial detainee possesses with respect to his suicidal behavior. While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment. *See City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001). In order to sustain a § 1983 claim against individuals for failure to provide adequate medical care, a plaintiff must show that defendants acted with "deliberate indifference to serious medical needs." *Watkins,* 273 F.3d at 686 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

Suicide is a difficult event to predict and prevent and often occurs without warning. Both the common law and the recently developed constitutional law applying to those in custody have taken this uncertainty into account in developing rules of liability based on foreseeability. In *Barber v. City of Salem*, this Court held that:

> the proper inquiry concerning the liability of a City and its employees in both their official and individual capacities under section 1983 for a jail detainee's suicide is: whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.

953 F.2d 232, 239-40 (6th Cir. 1992) (adopting the holding of *Popham v. City of Talladega*, 908 F.2d 1561, 1563-64 (11th Cir. 1990)). *Barber* confirmed an earlier holding that there is no general constitutional right of detainees to receive suicide screenings or to be placed in suicide safe facilities, unless the detainee has somehow demonstrated a strong likelihood of committing suicide. *See Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989); *Crocker v. County of Macomb*, No. 03-2423, 2005 WL 19473, at *5 (6th Cir. Jan. 4, 2005) (unpublished) (finding no change in the law since *Danese* was decided in 1989). As one commentator put it, "[a] right to screening for suicidal propensities or tendencies arises when it is *obvious* that an inmate has such tendency or propensity" (emphasis added) – in other words, when the suicide is clearly foreseeable. George J. Franks, *The Conundrum of Federal Jail Suicide Case Law Under Section 1983 and Its Double Bind for Jail Administrators*, 17 Law & Psychol. Rev. 117, 125 (1993).

Here, plaintiff has presented no evidence to support his claim that Officer Gross actually knew that Gray was at risk of committing suicide. All of Gray's complaints had been of a physical nature, and none of his behavior had been self-injurious. He did not demonstrate a "strong likelihood" of committing suicide. The only conceivable way that any individual officer could have possibly concluded that Gray was a suicide risk was to have obtained and appropriately pieced together the knowledge of every other officer involved in the case. And as the District Court said, "[t]he test for deliberate indifference is a subjective test . . . not an objective test for collective knowledge."

Because Gray's conduct and statements did not give rise to a constitutional duty on the part of his jailors to screen or monitor him for suicide, there is no evidence that Officer Gross violated Gray's constitutional rights in any way. Officer Gross is therefore entitled to qualified immunity.

### B. There Is No Evidence That a Policy or Custom of the City of Detroit Was the "Moving Force" Behind a Violation of Gray's Constitutional Rights

The plaintiff seeks to hold the City directly liable for Gray's suicide even if no city employee is individually liable under the Due Process Clause. "[A] municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978)). Municipal liability must rest on a direct causal connection between the policies or customs of the city and the constitutional injury to the plaintiff; "[r]espondeat superior or vicarious liability will not attach under § 1983." *Id.* at 385. When an officer violates a plaintiff's rights that are not "clearly established," but a city's policy was the "moving force" behind the constitutional violation, the municipality may be liable even though the individual officer is immune. *See Barber*, 953 F.2d at 238 ("[I]t is possible that city officials may be entitled to qualified immunity for certain actions while the municipality may nevertheless be held liable for the same actions."); *Scott v. Clay County, Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) ("[I]f the legal requirements of *municipal* or *county* civil rights liability are satisfied, qualified immunity will *not* automatically excuse a municipality or county from constitutional liability, even where the municipal or county actors were personally absolved by qualified immunity, *if* those agents *in fact* had invaded the plaintiff's constitutional rights.") (emphasis in original); *see also Canton*, 489 U.S. at 389-90 (ruling that municipalities may, in limited circumstances, be responsible for constitutional violations). Other circuits have also concluded that a municipality may be liable under *Monell* even though no employee is liable. *See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983.") (emphasis in original); *Fagan v. City of Vineland*, 22 F.3d 1283, 1294 (3d Cir. 1994) ("[A] municipality can be liable under section 1983 and the Fourteenth Amendment for a failure to train its police officers with respect to high-speed automobile chases, even if no individual officer participating in the chase violated the Constitution."). *But see*, *e.g.*, *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155 n.4 (10th Cir. 2001) (citing cases from First, Third, and Seventh Circuits critical of this aspect of *Fagan*.)

It is arguable, therefore, that the District Court erred in its conclusion that "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." Assuming for the sake of argument that this Circuit permits a municipality to be held liable in the absence of any employee's committing a constitutional violation, the remaining question for us then is whether the City's policy makers' decisions regarding suicide prevention were themselves constitutional violations, as plaintiff contends.

The Supreme Court has adopted an objective, "obviousness" approach to this question:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious*, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Canton*, 489 U.S. at 390 (emphasis added).  A municipality may be liable under § 1983 where the risks from its decision not to train its officers were "so obvious" as to constitute deliberate indifference to the rights of its citizens.[1]  As applied to suicide claims, the case law imposes a duty on the part of municipalities to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable.  Where such a risk is clear, the municipality has a duty to take reasonable steps to prevent the suicide.

Very few cases have upheld municipality liability for the suicide of a pre-trial detainee.  When faced with such a case, a divided panel of the Third Circuit applied the "so obvious" standard from *Canton* and affirmed (under a sufficiency of the evidence standard) the jury's finding that the decisions of city policymakers were unconstitutional and resulted in liability under § 1983.  *Simmons v. City of Philadelphia*, 947 F.2d 1042 (3d Cir. 1991).  In that case, the plaintiff's decedent ("Simmons"), a young man arrested for public intoxication, had become confused and agitated upon his arrest.  He was placed in a cell by himself and hung himself with a noose made from his pants.  Of twenty suicides by individuals in city-lockups in the five years prior to Simmons' death, fifteen had been arrested for public intoxication.  All twenty had killed themselves in the early hours of the morning and all had hanged themselves with articles of clothing.  One of plaintiff's experts testified that city officials had known of the correlation between intoxication and detainee suicides for at least four years.  While finding that the officer on the scene had not violated Simmons' constitutional rights, the jury did find the City liable under § 1983.  Because the city policymakers possessed this "profile" of typical suicidal detainees and failed to provide even minimal training for all its turnkey officers in how to recognize and respond to the profile, the Third Circuit held that there was sufficient evidence to support the jury's finding of liability.  Judge Weis dissented on grounds that the statistical risk of suicide (taking into account the thousands of detainees held) was too small to be "obvious" in this prisoner's case.

Even were we to follow the "profile" argument of the majority in *Simmons*, we would agree with the District Court in the instant case.  The facts of this case are distinguishable from *Simmons* and do not support a finding that the City of Detroit was deliberately indifferent to the constitutional rights of its pre-trial detainees, vis-a-vis their suicidal behavior.  There was no "profile" that warned officials that plaintiff was a suicide risk.  It is undisputed that the city produced and disseminated constitutionally adequate policies regarding monitoring for and prevention of suicidal behavior.[2]  The plaintiff's expert concluded that it was not these policies that were deficient, but rather their implementation and enforcement.  It is possible that, had the officers conducted a thorough screening for suicidal intent or kept a closer watch, Gray's suicide could have been prevented; but the Supreme Court has noted that "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Canton*, 489 U.S. at 392.  Pre-trial detainees do not have a constitutional right for cities to ensure, through supervision and discipline, that every possible measure be taken to prevent their suicidal efforts.  Detainees  have a right that city policies, training and discipline do not result in deliberate indifference to foreseeable and preventable suicide attempts.  Here, the plaintiff never made any statements that could reasonably be interpreted as threatening to harm himself, and none of his destructive acts were self-directed.  There was no indication that he would turn his anger and agitation upon himself.  The city's agents complied with city policies regarding medical care.  Gray was transferred to the Receiving Hospital

---

[1] Deliberate indifference remains distinct from mere negligence.  Where a city does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability. *See Molton v. City of Cleveland*, 839 F.2d 240, 247 (6th Cir. 1988).

[2] The policy included procedures to transfer any prisoner who "demonstrates suicidal tendencies" to the Crisis Center, to conduct 15 minute checks of prisoners identified as suicidal, and listed specific behaviors and comments from which jail personnel could identify a prisoner as suicidal.  J.A. at 215.

because of his physical complaints.  He was screened by an intake nurse before being placed in a cell.

Plaintiff has documented twenty in-custody deaths, other than Gray's, that occurred in the city's various holding facilities over the eight year period between June 24, 1993, and August 3, 2001.  Of these, only two were suicides, with one occurring in 1998 and one in 1999.  Plaintiff argues that policymakers failed to adequately discipline or enforce their policies with respect to monitoring, but as of Gray's death no other inmate had ever committed suicide in a Receiving Hospital cell.  In fact, defendants offer testimony that by using existing procedures, officers had been successful in interrupting eight suicide attempts in those cells in the past 20 years.  Gray's is the only completed suicide.  The plaintiff attempts to cast too wide a net by offering all in-custody deaths as evidence in support of deliberate indifference by the city in suicide cases.

Finally, plaintiff cites two official reports, in 1985 and 2000, as evidence of the city's deliberate indifference to the needs of prisoners such as himself.  The reports, however, were almost exclusively about the allegation that the city failed in general to provide adequate *medical* care, a duty which is readily distinguishable from the more narrow duty to try to prevent foreseeable suicides.  While the 1985 report did mention suicide, it expressed a concern that "clearly suicidal" prisoners might go unnoticed.  Considering the undisputed fact that Gray never gave any indication, either verbally or through his actions, that he harbored suicidal intentions, nor did the reports identify a "profile" of suicidal detainees, his suicidal tendencies were not sufficiently foreseeable to permit municipality liability.

Any failure of the city to train or discipline its officers with respect to its policies on preventing suicides by pre-trial detainees did not rise to the level of choosing to ignore obvious risks of foreseeable suicide attempts.  Therefore, the municipality did not violate Gray's due process rights and his § 1983 claim was properly dismissed.[3]

Accordingly, the summary judgment entered by the District Court is affirmed.

---

[3]With respect to plaintiff's argument that City is estopped, due to a prior consent decree, from denying it has a pattern and practice of violating detainees' constitutional rights, we agree with the District Court that the decree was not equivalent to a "judicial acceptance" of facts and therefore cannot work to estop the parties in a later proceeding.