**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0675n.06

**No. 13-2609**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 29, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KELLI ANN GRABOW, Individually and as Personal Representative of the Estate of KRISTINA PROCHNOW, deceased, | ) ) ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| COUNTY OF MACOMB, a political Subdivision of the State of Michigan, and DEPUTY AMY FRANKS, jointly and severally, | ) ) ) ) ) | |
| Defendants-Appellees. | ) | OPINION |

Before: WHITE, DONALD, and O'MALLEY[*], Circuit Judges.

O'MALLEY, Circuit Judge. This case involves Kristina Prochnow's suicide while an inmate at the Macomb County jail ("the jail"). Plaintiff-Appellant Kelli Ann Grabow, as personal representative of Prochnow's estate, brought suit against Defendants-Appellees County of Macomb ("the County") and Deputy Amy Franks under 42 U.S.C. § 1983 (2012) and state law, alleging that the defendants-appellees displayed deliberate indifference to Prochnow's serious medical needs while in custody. The district court granted summary judgment in favor of defendants-appellees, ultimately determining that Grabow failed to demonstrate the subjective

---

[*] The Honorable Kathleen M. O'Malley, Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

knowledge necessary for a constitutional violation under the Eighth and Fourteenth Amendments. For the following reasons, we **AFFIRM** the district court's judgment.

I

A

On August 13, 2011, Prochnow's boyfriend, Nicholas D'Aquila, contacted the police, claiming he was the victim of domestic violence and that "[t]here was something wrong with [Prochnow]." *Grabow v. Cnty. of Macomb*, No. 12-10105, 2013 WL 5816544, at *1 (E.D. Mich. Oct. 29, 2013). When the police arrived, Prochnow acted aggressively and attempted to run from the police, causing the police to taser her. At the scene, her arresting officer completed a "Jail Detention Card," answering "No" to a question on the card that asked if the prisoner had verbalized thoughts of suicide. The arresting officer then took Prochnow to Macomb County jail.

Prochnow previously had been incarcerated at the jail on at least twelve separate occasions. During a prior incarceration in 2008, officials placed Prochnow in observation status because she expressed an interest in self-harm. After twenty-five hours under observation, officials determined that Prochnow was no longer a suicide threat and moved her to the general population, where she remained for a month without incident. Prochnow was last booked into the jail in November 2010, where officials placed her on special medical alert status because she was pregnant. Prochnow also had been diagnosed with depression and bipolar disorder, and had attempted suicide on one occasion outside the jail in 2010.

B

The County has regulations in place covering prisoner intake and processing. *See id.* at *2–4. Under the regulations, intake officers have a duty to determine if an inmate is in need of

immediate medical or psychological treatment. If the inmate requires emergency treatment, the inmate is not to be accepted at the jail; the transporting officer is to take the inmate to a hospital. If the inmate is taken into the jail's custody, the transporting officer must present the "Jail Detention Card" along with the potential inmate. Upon receipt of the inmate, the intake officers immediately pat-down the inmate and assess her to determine if she will require special classification. At minimum, this requires the officers to complete an Initial Classification/Temporary Cell Assignment form based on direct questioning of the inmate and visual observations of her demeanor. The Initial Classification/Temporary Cell Assignment form includes six questions relating to suicide risk:

    (1) Does inmate hold a position of respect or prominence in the community or is the offense shocking in nature?
    (2) Do you have any unusual home or family problems we should know about?
    (3) Have you ever been in a mental institution or had psychiatric care?
    (4) Have you ever attempted or contemplated suicide? When? Where?
    (5) Are you now contemplating suicide?
    (6) Does the Inmate's behavior suggest a suicide risk?

*Id.* at *5. As of August 13, 2011, these regulations did not require that the officer who performs the pat-down also interview the inmate for the Initial Classification/Temporary Cell Assignment form.[1]

Once the intake officers complete the Initial Classification/Temporary Cell Assignment form, the computer booking officer enters the information into the jail's "Offendertrak" computer system, and then assigns the inmate to either general population or a specific mental health observation status. The officer assigns the inmate to a heightened observation status based on inmate need, current pending charges, inmate legal status, predatory risk, current

---

[1] After the events surrounding Prochnow's death, the jail updated its regulations. Now, the first officer who comes into contact with the inmate, usually the officer who performs the pat-down, must perform the initial screening based on the questions provided on the Initial Classification/Temporary Cell Assignment form. That officer will fill out the form by hand in front of the inmate and then pass the form and the Jail Detention Card to another officer, who enters the information into the computer network.

physical/mental health, and suicide risk factors. If the inmate demonstrates a high risk for self-harm or a desire or intent to commit suicide, the officer refers the inmate to the mental health staff and places the inmate in one of three observation statuses: (1) "High Observation,"[2] if the inmate is actively suicidal; (2) "Close Observation,"[3] if the inmate is not actively suicidal but has a recent history of suicide attempts; or (3) "Suicide Caution," if the inmate has been suicidal or indicated an intent to harm themselves in the past. After intake, a member of the health services staff screens all prisoners for both physical and mental health concerns. If the health services staff deems the prisoner to be a suicide risk, the staff member places the inmate in a High Observation cell with a "Suicide Caution" status. After the initial classification determination by the intake officers and health services staff, a more detailed, primary classification analysis by a Classification Officer will occur within seventy-two hours of arraignment. No inmate placed under High or Close Observation had committed suicide while at the jail prior to Prochnow's incarceration. Four jail inmates placed in the general population committed suicide in the year proceeding Prochnow's suicide.

All corrections deputies receive suicide prevention training during Corrections Academy. This includes instruction on identifying warning signs and risk factors for suicide and discussion of specific jail policies enacted to prevent suicide. Deputies must receive at least one hour of refresher suicide prevention training each year. All staff members are trained in CPR and first aid.

---

[2] An officer observes the inmate at least every 15 minutes under High Observation status.
[3] An officer observes the inmate at least every 30 minutes under Close Observation status. An inmate who is an active suicide risk would not be placed under Close Observation because, per Puchovan, "in Close Observation[] they have every tool they need to kill themselves." Doc. 66-5, PageID 1497.

C

Prochnow arrived at the jail at approximately 2:25 PM on August 13. Deputies Beverly Puchovan and Amy Franks processed Prochnow at intake. Puchovan and Franks frequently worked together at intake processing, with Puchovan at the front window as the initial intake officer and Franks at the computer stations behind the front window as the computer booking officer. Over time, Franks and Puchovan developed an informal "good to go" system for intake screening. First, Puchovan patted-down inmates upon arrival to search for contraband. Then, Puchovan asked the inmate variations of three of the required screening questions: (1) Have you been to this jail previously?; (2) Have you ever attempted suicide?; and (3) Do you feel like you want to hurt yourself now? If the inmate answered "no" to the last two questions, Puchovan informed Franks that the inmate was "good to go" and not a suicide risk. Franks would then complete the Initial Classification/Temporary Cell Assignment form and assign the inmate to general population without directly interviewing the inmate. If the inmate answered "yes" to either of Puchovan's final two questions, Franks would place the inmate on High Observation, again without further inquiry. Franks and Puchovan had used this "good to go" system in front of supervisors, but were never told their conduct was impermissible and were never disciplined.

Upon Prochnow's arrival at the jail, Puchovan patted-down Prochnow and asked Prochnow to remove her earrings, necklace, and belly button ring. Puchovan then asked Prochnow the three screening questions. Prochnow admitted that she had been to the prison before on multiple occasions, but said that she had never attempted suicide and did not feel like she wanted to hurt herself at that time. Puchovan told Franks that Prochnow was "good to go," and Franks assigned Prochnow to a general population holding cell at 2:34 PM. Franks watched Puchovan pat-down Prochnow and admitted to recognizing Prochnow from Prochnow's previous

5

incarcerations at the jail. Franks did not speak with Prochnow at any time between when Prochnow arrived at the jail and when Franks's shift ended. Despite this, Franks completed the Initial Classification/Temporary Cell Assignment form indicating that the answer Prochnow gave to each of the six suicide risk questions on the form had been "no."

As the computer booking officer, Franks had access to the jail's Offendertrak system, which she could search to view an inmate's history at the jail. Prochnow's profile in Offendertrak included an alert based on her suicide watch status in 2008. Franks claims she did not see the alert and nothing in the record suggests that Prochnow's profile would have been visible to Franks at booking, or that Franks attempted to access Prochnow's profile. Franks testified that when a booking officer enters information from an inmate's Jail Detention Card, the computer generates the intake form, a property form, and a mugshot; she did not testify that the computer generates an inmate's Offendertrak profile or any "alerts" from an inmate's prior visits. More to the point, Franks testified that she did not look at records from Prochnow's previous visits at Prochnow's intake, and she denied the existence of any intake procedure where "folks in booking would . . . go through [an inmate's] previous jail records to see what had happened to her the last times that she had been [t]here[.]" Doc. 66-4, PageID 1467.

After Prochnow's intake, Prochnow met with nurse Michelle Mason. Correctional Medical Services ("CMS") employed Mason at the jail. Mason testified that, while performing her initial screening of the inmate, she would glance at the Initial Classification/Temporary Cell Assignment form, but would perform an entirely independent assessment of the inmate. Prochnow told Mason of her prior diagnoses of depression and bipolar disorder, as well as present feelings of hopelessness due to the arrest. Prochnow also informed Mason of her 2010 suicide attempt. Under prison policies, those answers should have prompted Mason to

6

recommend an immediate mental health referral, but instead, Mason recommended that a mental health evaluation of Prochnow occur within seven days and placed her on a ten-day detox protocol for suspected recent drug use. Mason did not believe that Prochnow needed to be on suicide watch, but recommended that prison officials monitor Prochnow for suicide risk and depression.

After her medical evaluation, prison officials placed Prochnow into a holding cell, where she vomited and had diarrhea that night.

D

On August 14, 2011, Franks again worked as an intake officer. Franks testified that, upon arrival, she likely reviewed Prochnow's paperwork and noticed that Mason had put Prochnow on detox protocol. Based on this, Franks moved Prochnow to a different holding cell with beds. Franks spoke with Prochnow at the time, and Prochnow appeared to be in good spirits, even making jokes about items she had stolen from Wal-Mart. Franks testified that Prochnow did not show any signs of physical or mental problems on August 14.

Under the detox protocol, CMS staff continued to evaluate Prochnow. They took her temperature, pulse, and blood pressure at least every twelve hours. Another inmate testified that Prochnow was distracted, but did not act depressed and did not require medical attention.

E

Franks did not work on August 15, 2011. Officers took Prochnow to a scheduled hearing that morning at Macomb County Circuit Court. This hearing involved a prior offense where Prochnow failed to appear for sentencing. At the hearing, the judge imposed a $10,000 bond and remanded Prochnow to custody for at least two more weeks. Prochnow spoke to a friend about

7

her son at the hearing and planned to meet with the friend and a family member during visitation later that evening.

After the hearing, prison officials returned Prochnow to her cell. An inmate testified that Prochnow appeared thin and was having problems moving because of pain throughout her body. At 3 PM that afternoon, Prochnow complained to Mason that she had a rash. Mason promised to look at the rash after a break. While Mason was on break, Prochnow hanged herself in her cell. A deputy found Prochnow at approximately 3:22 PM, and prison officials transported her to a local hospital, where she died two days later.

Macomb County Sheriff Anthony Wickersham testified that the County investigated the circumstances of Prochnow's death. The County determined that Franks falsified the intake form, but neither Franks nor Puchovan was disciplined. Jail Administrator Michelle Sanborn later testified that Prochnow's placement in general population likely was inappropriate.

F

Grabow, as personal representative of Prochnow's estate, brought suit against Franks and the County.[4] Grabow asserted claims under 42 U.S.C. § 1983 against Franks and the County for deliberate indifference and against the County for failure to train. Grabow also asserted state law gross negligence claims against Franks.[5] Defendants-Appellees Franks and the County moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) and for summary judgment on all counts. The district court granted defendants-appellees' motion on all counts. *Grabow*, 2013 WL 581544, at *16. On the deliberate indifference claims against Franks, the district court held that Grabow did demonstrate a genuine issue of material fact on the objective

---

[4] Grabow also brought suit against a variety of other defendants. Grabow voluntarily dismissed the claims against Sheriff Anthony Wickersham, CMS employees Catherine Stalinski and Kelly Hedke, and Deputy Gregory Shumacher. Grabow settled the claims against CMS, Michelle Mason, and CMS clinician Stephanie Harmon.

[5] Grabow had also asserted state law gross negligence claims against the County. The district court dismissed those claims, and Grabow does not appeal that dismissal.

8

prong of the analysis but failed to raise any issue of material fact as to Franks's subjective knowledge of a substantial risk of Prochnow committing suicide or as to any causal connection between Franks's actions and Prochnow's eventual suicide. *Id.* at \*13–15. For the claims against the County, the district court held that, because Grabow failed to demonstrate an underlying constitutional violation by Franks, the claim against the County must be dismissed. *Id.* at \*15. Finally, the district court dismissed the state law claims against Franks because Grabow failed to present evidence creating a genuine issue of material fact that Franks was the proximate cause of Prochnow's suicide. *Id.* at \*16.

We have jurisdiction over the appeal under 28 U.S.C. § 1291 (2012).

II

The district court granted both the defendants-appellees' Rule 12(c) motion for judgment on the pleadings and the motion for summary judgment under Rule 56. *Id.* at \*16. Because the trial court considered evidence outside of the pleadings in issuing its judgment, we characterize this appeal as one reviewing the propriety of summary judgment for the defendants-appellees on this record.

We review the district court's grant of summary judgment de novo. *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). We construe the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). Summary judgment will be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *First Nat'l Bank & Trust Co. v. Brant* (In re

9

*Calumet Farm, Inc.*), 398 F.3d 555, 558–59 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).  If the nonmovant's evidence is "merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50 (internal citations omitted).  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

We review the district court's analysis of state law de novo.  *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991)).

III

A.  Deliberate Indifference Claims under the Eighth and Fourteenth Amendments

Grabow asserts claims under 42 U.S.C. § 1983 against both Franks and the County for deliberate indifference to Prochnow's serious medical needs.  In the context of a motion for summary judgment regarding a claim asserted under § 1983, the plaintiff "must demonstrate a genuine issue of material fact as to the following two elements:  (1) the deprivation of a right secured by the Constitution or laws of the United States and (2) that the deprivation was caused by a person acting under color of state law."  *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (internal quotation marks omitted).

Pursuant to the Eighth Amendment, "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny."  *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  The Eighth Amendment itself does not apply to pretrial detainees such as Prochnow, but the Fourteenth Amendment grants analogous rights to adequate medical treatment to pretrial detainees.  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  Prison

officials must "take reasonable measures to guarantee the safety of the inmates," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)), because inmates have a constitutional right to adequate medical care, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Inmates do not have an Eighth Amendment right "to be screened correctly for suicidal tendencies," but "prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001); *see also Perez v. Oakland Cnty.*, 466 F.3d 416, 423 (6th Cir. 2006) ("[T]he Eighth Amendment prohibits mistreatment only if it is tantamount to punishment, and thus courts have imposed liability upon prison officials only where they are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." (internal quotation marks omitted)). Prison officials violate an inmate's Eighth and Fourteenth Amendment right to adequate medical treatment when: (1) "the deprivation alleged [is], objectively, sufficiently serious" such that the inmate "is incarcerated under conditions posing a substantial risk of serious harm"; and (2) the prison official subjectively demonstrates "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks and citations omitted).

A "sufficiently serious" medical need requires the plaintiff to show that "[the inmate] is incarcerated under conditions imposing a substantial risk of serious harm." *Miller*, 408 F.3d at 812 (internal citations omitted). An inmate's "psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Comstock*, 273 F.3d at 703. Thus, a plaintiff meets the objective component of the Eighth Amendment analysis by demonstrating that the inmate exhibited suicidal tendencies during his or her detention or that he

11

"posed a strong likelihood of another suicide attempt." *Perez*, 466 F.3d at 424; *Linden v. Washtenaw Cnty.*, 167 F. App'x 410, 416 (6th Cir. 2006).

Deliberate indifference is "a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835; *Estelle*, 429 U.S. at 104, 106; *see also Reilly v. Vadlamudi*, 680 F.3d 617, 623–24 (6th Cir. 2012) ("Deliberate indifference is characterized by obduracy or wantonness—it cannot be predicated on negligence, inadvertence, or good faith error."); *Perez*, 566 F.3d at 431 ("A finding of negligence does not satisfy the deliberate indifference standard."). Deliberate indifference, however, does not require "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. The Supreme Court has concluded that "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836; *see also Galloway v. Anuszkiewicz*, 518 F. App'x 330, 333 (6th Cir. 2013) (holding that deliberate indifference is a "stringent standard of fault," requiring that the official "disregarded a known or obvious consequence of his action" (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011))).

To prove deliberate indifference, the plaintiff must allege facts that show "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Comstock*, 273 F.3d at 703. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Linden*, 167 F. App'x at 417. An official's knowledge of a sufficient risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

In the context of inmate suicide cases, "the proper inquiry concerning the liability of a City and its employees in both their official and individual capacities under § 1983 . . . is[] whether the decedent showed a strong likelihood that [s]he would attempt to take [her] own life in such a manner that failure to take adequate precautions amounted to a deliberate indifference to the decedent's serious medical needs." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (quoting *Barber v. City of Salem*, 953 F.2d 232, 239–40 (6th Cir. 1992)); *see also Jerauld v. Carl*, 405 F. App'x 970, 976 (6th Cir. 2010) ("[T]he central inquiry is whether the defendants identified [the inmate's] suicidal tendencies and were deliberately indifferent to them."); *Cooper v. Cnty. of Washtenaw*, 222 F. App'x 459, 470 (6th Cir. 2007) (finding that a claim that an official "should have known that [an inmate] was suicidal" was "insufficient for a deliberate indifference claim").

Under our deliberate indifference jurisprudence, we have held that a plaintiff demonstrated deliberate indifference sufficient to overcome a motion for summary judgment when, for example: (1) the prison official who placed the inmate on suicide watch failed to review medical records and psychological tests administered to an inmate, did not speak to officers who arranged psychological consults for an inmate or observed the inmate on a daily basis, did not speak with psychologists who previously met with an inmate, and only asked the inmate a few cursory questions before removing the inmate from close observation, *Comstock*, 273 F.3d at 707–10; (2) a prison official had actual knowledge of an inmate's past suicide attempts, knew that the inmate's suicidal tendencies were provoked by his kidney conditions, and ignored the inmate's crying, complaints of kidney pain, and other suicidal gestures on the night of his death, *Schultz v. Sillman*, 148 F. App'x 396, 401–03 (6th Cir. 2005); and (3) a prison official moved an inmate from suicide watch even though the official knew the inmate threatened

13

and attempted suicide on several occasions within the same month in the jail and had previously been placed on behavior and suicide watches during multiple prior incarcerations at the same jail, *Perez*, 466 F.3d at 424–26.

On the other hand, we have held that the plaintiff failed to overcome a motion for summary judgment when the plaintiff only demonstrated, for example that (1) the inmate yelled, destroyed items in his cell, had chest pain, and banged on his cell, but no single prison official observed all of these actions, *Gray*, 399 F.3d at 614–16; and (2) the inmate's behavior prompted the prison psychologist to issue a suicide precautions blanket and order observations every fifteen minutes, but the psychologist failed to take the additional precaution of directly warning the jail staff that the inmate might be suicidal, *Galloway*, 518 F. App'x at 331–35.

Thus, the plaintiff must demonstrate either subjective knowledge, directly or indirectly, or that the official "merely refused to verify underlying facts that he strongly suspected to be true" to overcome a motion for summary judgment on a deliberate indifference claim. *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 843 n.8).

### B.  Deliberate Indifference Claims against Franks

Grabow argues that she need only demonstrate that Franks should have perceived facts sufficient to recognize Prochnow's pronounced suicidal tendencies.  Under Grabow's proposed approach, we should consider the following circumstantial evidence to be highly relevant: Franks recognized Prochnow from their prior interactions, Prochnow previously had been under suicide watch at the jail, Prochnow falsified the Initial Classification/Temporary Cell Assignment form, and the alert in the Offendertrak system noted that Prochnow was once considered a suicide risk. Grabow proposes that, based on this evidence, there is sufficient circumstantial evidence that Franks inferred a substantial risk to Prochnow's safety, Franks did in fact draw this inference,

and she disregarded the risk. *See Comstock*, 273 F.3d at 703. At a minimum, Grabow asserts that Franks "refused to verify" facts about Prochnow which Franks had reason to suspect were true. *See id.*

The district court disagreed with Grabow's arguments, finding that Grabow failed to create a genuine issue of material fact regarding Franks's subjective knowledge of Prochnow's serious medical condition sufficient to show deliberate indifference. *Grabow*, 2013 WL 581544, at *13–15. Franks was not working at the jail in 2008 when Prochnow had been placed on suicide watch while there. Prochnow also spent less than two days under suicide watch in 2008, spending the subsequent month of her incarceration in general population without incident. Prochnow had also been incarcerated on three subsequent occasions, again all without incident. The district court found that the "only thing Franks knew was that Prochnow was arrested and brought to the jail on multiple occasions in the past, and that she was currently in jail for domestic violence." *Id.* at *14. The district court found this an insufficient basis upon which to find that Franks had subjective knowledge, or even a strong suspicion, of Prochnow's suicidal tendencies. The district court also found that, even assuming *arguendo* that Franks subjectively perceived sufficient facts regarding Prochnow's past suicidal tendencies, Grabow presented no evidence that Franks drew any inference regarding Prochnow's current medical needs or disregarded an obvious inference about those needs. Though Grabow claimed that Franks's failure to conduct a face-to-face interview was sufficient circumstantial evidence of her knowledge, the district court concluded that Franks's failure to conduct the interview was remedied by Mason's later medical evaluation, where Mason found that Franks was not a suicide risk. Finally, the district court found that undisputed evidence demonstrated that, even if Franks

15

had interviewed Prochnow, it was unlikely she would have placed Prochnow in a High Observation cell given the statements Prochnow made to Puchovan and Mason.

We agree with the district court's analysis. The extent of Franks's interaction with Prochnow between August 13 and August 15, 2011, consisted of: (1) Franks's observing Puchovan's search of Prochnow; (2) Puchovan's telling Franks that Prochnow was "good to go;" (3) Franks's moving Prochnow to a holding cell with a bed on August 14; and (4) Franks and Prochnow's joking about Prochnow allegedly stealing items from a Wal-Mart. Franks did not work on August 15, the day that Prochnow outwardly expressed a depressed condition and committed suicide. Thus, all Franks knew regarding Prochnow's then-current incarceration was that Prochnow was arrested for domestic abuse and that Prochnow was undergoing a detox protocol. This is insufficient to create a genuine issue of material fact regarding Franks's subjective knowledge of Prochnow's suicidal tendencies. Though Franks clearly failed to make inquiries required by her job duties, there is no evidence that she had any reason to suspect that those inquiries would reveal suicidal tendencies.

There is no doubt Franks was negligent. Grabow must allege more, however, to allow us to impute sufficient knowledge to Franks. Deliberate indifference requires a level of culpability higher than negligence, one that more closely approximates reckless disregard for a known risk. *Farmer*, 511 U.S. at 836; *Reilly*, 680 F.3d at 623–24; *Perez*, 566 F.3d at 431. The prison regulations did not require that Puchovan ask all six screening questions during pat-down or that only Franks could perform the face-to-face interview. Also, the regulations did not appear to require that the computer booking officer search the Offendertrak system for alerts. Thus, while Franks was negligent during the intake of Prochnow, Franks did not recklessly disregard or intentionally avoid known risks. Franks and Puchovan together attempted to determine if

16

Prochnow would be a suicide risk based on the three screening questions Puchovan asked Prochnow. As the Supreme Court has explained, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

Even if we impute knowledge of the Offendertrak alert to Franks, it is not clear this knowledge would establish that Franks observed facts sufficient to infer a substantial risk. If Franks learned of Prochnow's 2008 placement on suicide watch status from the Offendertrak system, Franks would also have known that Prochnow remained on suicide watch for less than two days before spending almost a month in general population. Franks would also have learned that Prochnow had been incarcerated three subsequent times, all in general population and all without incident. Franks knew that Prochnow told Puchovan that she had never attempted suicide and did not have any present intent to harm herself. Moreover, Franks interacted with Prochnow on April 14, and Prochnow appeared upbeat, which is inconsistent with an inference of a substantial risk of suicide. Franks did not see Prochnow on April 15, and, thus, could not have observed Prochnow after her hearing. Franks simply assigned Prochnow to a general population holding cell, as had been done during Prochnow's three prior incarcerations. The next day, Franks checked Prochnow's file, recognized that Mason assigned Prochnow to a detox protocol, and moved Prochnow to a holding cell with a bed to make her more comfortable. Nothing about Franks's actions indicates subjective knowledge or a deliberate disregard of a known risk to Prochnow's safety.

We conclude that Grabow failed to establish that Prochnow "showed a strong likelihood that [she] would attempt to take [her] own life in such a manner that failure to take adequate precautions amounted to a deliberate indifference to [her] serious medical needs." *Gray*,

17

399 F.3d at 616. Although Franks acted negligently in utilizing the "good to go" policy in lieu of conducting a face-to-face interview, Grabow has failed to present facts which would show that Franks had the necessary subjective knowledge to support a deliberate indifference claim under the Eighth and Fourteenth Amendments.

Because we find that Grabow has failed to demonstrate a genuine issue of material fact as to the subjective prong of the Eighth and Fourteenth Amendments analysis, we decline to address the district court's discussion of the objective prong of this analysis, its causation analysis, or its qualified immunity analysis. We affirm the district court's grant of summary judgment on Grabow's § 1983 claim against Franks.

IV

Grabow also asserted § 1983 claims against Macomb County, arguing that the County itself was deliberately indifferent and failed to adequately train its staff. Under § 1983, municipalities are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original). Thus, a municipality cannot be held liable pursuant to a theory of *respondeat superior* under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A municipality only can be directly liable under § 1983 when a policy or custom of the municipality causes a constitutional violation by one of its employees. *Id.* at 694; *Gray*, 399 F.3d at 617. For municipal liability, there must be an underlying unconstitutional act due to a policy or custom of the municipality, even if an officer in his or her individual capacity can avoid liability through qualified immunity. *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007); *Gray*, 399 F.3d at 617 ("When an officer violates a plaintiff's rights that are not 'clearly established,' but a city's policy was the 'moving force' behind the constitutional violation, the municipality may be liable even though the individual officer is immune."); *Gregory v. Shelby*

*Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000) ("For liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort."). "A municipality may be liable under § 1983 where the risks from its decision not to train its officers were 'so obvious' as to constitute deliberate indifference to the rights of its citizens. As applied to suicide claims, the case law imposes a duty on the part of municipalities to recognize, or at least not ignore, obvious risks of suicide that are foreseeable." *Gray*, 399 F.3d at 618. *But see id.* ("Very few cases have upheld municipality liability for the suicide of a pre-trial detainee.").

We affirm the grant of summary judgment on Grabow's municipal liability claim against Macomb County. As discussed in Part III, *supra*, Grabow failed to present facts upon which a reasonable juror could conclude that Franks violated any of Prochnow's Eighth and Fourteenth Amendment rights to adequate medical care. Absent an underlying constitutional violation, Grabow's claim against the county under § 1983 must also fail. *Wilson*, 477 F.3d at 340 ("There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act.").

V

Finally, Grabow asserted claims against Franks for gross negligence under Michigan state law. In response to Grabow's claims, Franks asserted immunity under Mich. Comp. Law § 691.1407, which grants immunity from tort liability to government employees if the following elements are satisfied:

(a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority;
(b) The governmental agency is engaged in the exercise or discharge of a governmental function;
(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

19

The parties do not dispute that elements (a) and (b) apply. The only question is whether Franks's conduct amounted to gross negligence that was *the* proximate cause of Prochnow's death.

Section 691.1407(8)(a) defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." The Michigan Supreme Court has held that an employee's conduct is "the proximate cause" of an injury only when it is "the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (Mich. 2000); *see also Jasinski v. Tyler*, 729 F.3d 531, 544 (6th Cir. 2013) (noting that the "proximate-cause inquiry under the [Michigan statute] is different from proximate-cause analysis in other contexts because of the use of the definite article 'the[.]'"). The Michigan legislature intended to limit employee liability under § 691.1407 to situations where the employee was "substantially more than negligent." *Maiden v. Rozwood*, 597 N.W.2d 817, 824 (Mich. 1999). In *Kruger v. White Lake Township*, the Michigan Court of Appeals assumed without deciding that officers were grossly negligent when they arrested Kruger and handcuffed her to a ballet bar in the booking room because all holding cells were full. 648 N.W.2d 660, 663 (Mich. App. 2002). Kruger eventually escaped, but was struck and killed by a vehicle during her escape. *Id.* at 662. The court found that, even if the officers were grossly negligent, *the* proximate cause of Kruger's death was her own action of running into traffic. *Id.* at 663.

Based on this provision, the district court found that Franks was not the proximate cause of Prochnow's death, and we agree. As discussed in Part III, *supra*, Franks was clearly negligent in failing to perform the required in-person interview in order to complete the Initial Classification/Temporary Cell Assignment form. Even if we assume that Franks's actions constituted "substantially more than negligence" and that her acts were a cause of Prochnow's

suicide—assumptions we make without deciding—it is clear they were not the one, immediate and direct cause of Prochnow's death. Prochnow did not verbalize any intent to commit suicide to the arresting officer, told Puchovan that she did not currently intend to harm herself, and assured Mason that she did not currently intend to harm herself. Two days later, Prochnow caused her own death by hanging. As in *Kruger*, it was Prochnow's own actions that were the proximate cause of her suicide.[6] Thus, while Franks's negligent acts might be characterized as a part of the causal chain that ended in Prochnow's suicide, Grabow has failed to create a genuine issue of material fact that Franks was *the* proximate cause of Prochnow's suicide as that term is defined by Michigan law.

## VI

For the foregoing reasons, we affirm the district court's grant of summary judgment for defendants-appellees Franks and the County of Macomb.

---

[6] There were no allegations that Prochnow was so mentally incompetent as to be incapable of making the decision to end her own life, and there is nothing in the record that could support such an allegation.

**BERNICE BOUIE DONALD, Circuit Judge, concurring.** I agree with the panel's analysis and outcome. I write separately to note the troubling statistics surrounding suicides in the Macomb County Jail.

The Macomb County Jail has a capacity of 1,238 inmates and processes about 19,000 inmates annually.[7] Macomb County Sheriff's Office Annual Report 11 (2012). In the year surrounding Prochnow's August 2011 suicide, *five* Macomb County Jail inmates (including Prochnow) committed suicide. Only six percent of U.S. jails reported two or more deaths by any cause in 2011; eighty-one percent of jails reported no deaths. U.S. Dep't of Justice, Bureau of Justice Statistics, NCJ 242186, Mortality Rates in Local Jails and State Prisons, 2000–2011 1. In Michigan, only sixteen percent of jails reported one or more inmate deaths by any cause. *Id.* at 18. Macomb County Jail's five suicides alone accounted for nearly *twenty percent* of Michigan's twenty-four total reported jail inmate deaths by any cause in 2011, *id.* at 15, despite the fact that the Jail processed only about eight percent of the state's total annual jail inmates and held only seven percent of the state's jail inmates at any one time, *see supra* n.1. This case is not the first time that this Court has taken notice of Macomb County Jail's high suicide rate. In *Crocker v. County of Macomb*, this Court noted that Crocker's June 2001 suicide was also the fifth suicide at the Jail in less than one year. 119 F. App'x 718, 721 (6th Cir. 2005).

---

[7]On average, the total Michigan jail population per day in 2011 was 16,541. Mortality Rates in Local Jails and State Prisons 17. The total annual Michigan jail population for 2010 was 219,266. JPIS Report from Michigan Department of Corrections, Office of Community Corrections 84 (2010).

Macomb County Jail's disturbing suicide rate is a microcosm of the larger jail-suicide problem, which accounted for thirty-five percent of all jail deaths in the U.S. in 2011. *Id.* at 7. Our decision cites no less than nine prisoner-suicide cases, most of which originate in Michigan. *See Galloway v. Anuszkiewicz*, 518 F. App'x 330 (6th Cir. 2013); *Jerauld v. Carl*, 405 F. App'x 970 (6th Cir. 2010); *Cooper v. Cnty. of Washtenaw*, 222 F. App'x 459, 470 (6th Cir. 2007); *Perez v. Oakland Cnty.*, 466 F.3d 416 (6th Cir. 2006); *Linden v. Washtenaw Cnty.*, 167 F. App'x 410 (6th Cir. 2006); *Schultz v. Sillman*, 148 F. App'x 396, 401–03 (6th Cir. 2005); *Gray v. City of Detroit*, 399 F.3d 612 (6th Cir. 2005); *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001); *Barber v. City of Salem*, 953 F.2d 232 (6th Cir. 1992). Our decision could have cited two more cases, both of which occurred prior to Prochnow's suicide, where Macomb County itself was before this Court or district courts in this Circuit as a defendant in an inmate-suicide action. *See Crocker*, 119 F. App'x 718; *House v. Cnty. of Macomb*, 303 F. Supp. 2d 850 (E.D. Mich. 2004).

Most of these cases, like the one before us, deal with the suicide of inmates who had a known history of mental illness and suicidal tendencies. And in those cases, like this one, this Court reached the conclusion, first put forward in *Danese v. Asman*, 875 F.2d 1239 (6th Cir. 1989), that there is no recognized constitutional right to be properly screened for suicide risk. Thus, no official or municipality can be held liable under § 1983 for inmate suicides where there has been improper screening or no screening. *See Barber*, 953 F.3d at 237–38.

23

And yet the suicides keep happening. How many times should this question come before this Court before the need for adequate suicide precautions for mentally-ill inmates becomes "clearly established law" for which officials can be held accountable? *Id.* at 236. How many times should Macomb County come before this Court before "the need for better training [becomes] so obvious" that it should be held liable? *Id.* While current law offers no refuge for Grabow, the time may come for this Court to rethink what constitutional protections are available to mentally ill, potentially suicidal inmates and what sort of liability may be imposed on defendants like Macomb County, where these suicides continue to occur at an alarming rate.