RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0344p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

STEPHANIE TROUTMAN, Administratrix of the Estate of
Charles R. Troutman, Jr.,

*Plaintiff-Appellant*,

*v.*

LOUISVILLE METRO DEPARTMENT OF CORRECTIONS, et al.,

*Defendants*,

LOUISVILLE-JEFFERSON COUNTY METRO GOVERNMENT;
MARK E. BOLTON, individually and in his official
capacity as Director, Louisville Metro Department of
Corrections; JAMES COX, Prison Classification
Interviewer, individually and in his official capacity,

*Defendants-Appellees*.

> No. 20-5290

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:16-cv-00742—David J. Hale, District Judge.

Argued: October 6, 2020

Decided and Filed: October 29, 2020

Before: DAUGHTERY, DONALD, and READLER, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, for Appellant. J. Denis Ogburn, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellees. **ON BRIEF:** Alphonse A. Gerhardstein, M. Caroline Hyatt, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Larry D. Simon, Louisville, Kentucky, for Appellant. J. Denis Ogburn, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellees. David M. Shapiro, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Chicago, Illinois, for Amici Curiae.

---

**OPINION**

---

BERNICE BOUIE DONALD, Circuit Judge.   In this case, Charles Troutman, a pretrial detainee at the Louisville Metro Department of Corrections ("LMDC"), committed suicide after jail officials placed him in solitary confinement despite a recent suicide attempt.   Plaintiff Stephanie Troutman ("Stephanie"), Charles' daughter and administrator of his estate, filed this action pursuant to 42 U.S.C. § 1983, alleging that the various defendants—(1) the classification officer, James Cox ("Cox"); (2) the LMDC Director, Mark Bolton ("Bolton"); and (3) the municipality itself, Louisville-Jefferson County Metro Government ("Louisville Metro")—were deliberately indifferent to the serious medical needs of her father.   Stephanie appeals the district court's grant of summary judgment in favor of all three defendants.   For the reasons explained below, we REVERSE and REMAND the district court's order granting summary judgment in favor of Cox. We AFFIRM the grant of summary judgment in favor of Bolton and Louisville-Jefferson County Metro Government.

## I.  BACKGROUND

### A.  *Charles Troutman's Arrest and Suicide Attempt*

The Louisville Metro Police arrested Charles for various drug offenses on November 12, 2015.   His intake paperwork showed that he was a daily user of heroin and methamphetamine, including use on the date of his arrest.   Early on November 13, Charles first attempted suicide inside the holding cell.   According to the deposition testimony of Sergeant Eric Schmitt ("Schmitt"), another officer found Charles "with gauze tied so tightly around his neck that [Charles] was choking."   Charles' "inmate notes" prepared by Cox, show that Charles attempted to hang himself on the booking floor.   The officer who discovered Charles said that the gauze was so tight that he could not get a finger in.   Charles also allegedly asked the responding officer why he did not leave Charles for a few more minutes.

The reported reasons for the suicide attempt vary.   Charles told Schmitt that he "was a junkie and had no reason to live because he was going to get 20 years for his charges," but

Dr. Donna Smith ("Smith") later testified that Charles told her he was upset at being in holding and felt like staff was ignoring him and that Charles knew if he did "something like that, that he would get moved out of there immediately." Smith did not consider the attempt to be serious because he did not hang from anything and did not have any mark on his neck. Bolton thought that "the attempt was really nothing more than attention getting."

That same day, November 13, jail staff placed Charles on Level 1 suicide observation and detox. A nurse conducted a medical screening soon after the suicide attempt. That screening showed that Charles attempted suicide three to four times in the past, and that he was "currently thinking about suicide" and had "a plan or suicide instrument in [his] possession."[1] Additionally, that report noted that Charles showed signs of depression; expressed feelings of hopelessness; appeared anxious, afraid, or angry; and appeared embarrassed or ashamed. The report also noted that the screener did not "feel that the subject [wa]s capable of understanding all questions being asked."

A November 14 report described Charles as distractible, agitated, and irritable with tangential thought processing and pressured speech. Charles explained that he had no head injuries within the prior six months, although Stephanie called the jail to report that he recently experienced a traumatic brain injury that required hospitalization.[2] No one in the jail conveyed that information to the medical staff, according to Smith's deposition testimony. Nonetheless, a behavioral health psychiatric evaluation conducted by Correct Care Solutions on November 16 noted that Charles experienced a traumatic brain injury the prior year which left him in a coma for nine days.

That November 14 report shows that Charles told medical staff "I'm not good at all, I'm dying! The nurses don't like me because I'm a junkie." The report also indicated sleep disturbance and minimal appetitive. A report from the following day, however, showed

---

[1]The paperwork is unclear as to when each of those attempts took place, aside from noting that at least one of them occurred in 2015 (which, presumably, was his attempt days before).

[2]Stephanie asserts that she made this call in response to her father's complaint that the jail counselor was disinterested in him. She attempted to get ahold of the counselor but was only able to leave a message with whom she thinks was a general jail receptionist.

improvement.  Charles denied any suicidal intent, remarking that "I love myself the most."  The reports also showed improvement in appetite and interaction with peers, though they did note continued significant sleep disturbances, presumably related to his detox.

On November 16, Charles first met with Smith.  Under relevant past medical history, Smith's evaluation indicated the traumatic brain injury the prior year as well as stuttering and hypertension.  Smith wrote that Charles denied his attempt was an actual suicide attempt and noted that he was calm and cooperative during the evaluation.  The two spoke about Charles' traumatic brain injury, but Smith did not further investigate that injury.  Nor did she speak with any of the officers present at the scene of the attempt, and thus she only later learned the extent to which Charles tightened the gauze around his neck or the condition in which the officers found Charles—"spitting and jerking."  According to Smith, during these three days of observation, "not one person said that [Charles] was suicidal, saw him crying, saw him sad, [or] saw him with a flat affect."

**B.  *Clearance to General Population***

On November 17, mental health officials cleared Charles to move to general population.  Bolton indicated that after staff cleared Charles to general population, there was nothing to indicate that he was acutely suicidal.  According to Bolton, "[t]here was nothing to indicate that [Charles] had--was--was going to kill himself.  If--if there was, we would've done something about it."

The following day, Stephanie called her father and became worried at the extent of Charles' crying, which Stephanie says was unusual for him.  Consistent with his explanation to the officers who found him after the suicide attempt, Charles expressed worry that he would receive a lengthy prison sentence.  Stephanie told her father that she thought she had the money lined up and that he would be out on bail in a couple of days.

**C.  *Move to Solitary***

On November 18, Charles got into a verbal altercation with another inmate.  Because of that altercation, jail officials moved Charles to the Community Corrections Center ("CCC")

4 North 1.  The CCC does not have single segregation cells.  Days later, on November 21, Charles received another disciplinary infraction for a physical altercation with another inmate, upon which staff moved him back from CCC to the main jail complex.[3]  Cox was responsible for Charles' subsequent placement, and he understood jail policy to require placement in solitary confinement pending disciplinary proceedings.  When Defendant Cox moved Charles to solitary, Cox knew that Charles had a prior suicide attempt in jail, though he was not privy to all of Charles' records from medical.[4]  Cox himself entered the note on November 13 indicating that Charles tried to hang himself in a booking cell.  Nonetheless, Cox understood Charles' clearance to return to general population as authorizing Charles for all movement within the jail.

Cox chose to place Charles in a solitary cell with barred windows.  He then decided to notify Nurse Brown ("Brown") of Charles' move to solitary.  In his deposition, Cox described the call to Brown as a "general courtesy" call.  Cox stated that his concern at the time was the risk of seizures from detox, not suicide.  Cox spoke with Brown who indicated that she would pass the message along to the Charge Nurse.  Cox entered the following into XJail, the record-keeping system: "INMATE MOVED TO H5D9 PENDING DISCIPLINARY.  NOTIFIED NURSE BROWN OF SINGLE CELL USE AND WAITING TO HERE [*sic*] BACK FROM MEDICAL ON THAT."  Cox stated in his deposition that he would expect to hear back if there were any problems with Charles going to that particular cell.[5]

---

[3]At this point, Defendants state in their response that Charles was in a single cell in this interim period, *i.e.* that he was already in a solitary cell before officials moved him to the cell in which he committed suicide.  The record reveals, however, that staff moved Charles from CCC to a general population dorm within the main jail, which held around thirty men.

[4]In his deposition, Cox explained that he would have been present on the booking floor during Charles' suicide attempt but that because of the configuration of desks, he did not physically see the attempt.  Nonetheless, he entered that attempt into Charles' jail records.

[5]According to Cox, since Charles' suicide, jail policy has changed.  No longer do officials move detainees into solitary pending disciplinary proceedings in most cases.  Further, detainees with a prior suicide attempt receive the "no bars" alert that would prevent any placement in a cell with bars like the one in which Charles killed himself.  The jail instituted these changes two to three months after Charles' suicide, although Ernst (the jail's classification coordinator) testified that the no-bar policy was in place as early as 2012 but changed throughout the years.  Cox believes these changes resulted from Charles' death "[a]long with many others."  Cox further notes that if the jail had implemented these changes on November 24, 2015, they would not have moved Charles to solitary confinement.

Later, however, Cox stated in his deposition that he understood jail policy to require at minimum verbal clearance from medical before placing someone like Charles in a solitary cell. In response to a 2014 suicide in a barred solitary cell,[6] the jail classification coordinator Kyle Ernst ("Ernst") circulated an email with a purported policy requiring classification officers to fill out a form showing explicit approval from medical staff to move an inmate to a single cell. This procedure required staff to call medical and obtain approval, specifically indicating who in medical made the approval. Jail staff received training on this clearance procedure: "[a]nytime anyone is placed in a single cell, they have to call the charge nurse and get clearance." If the charge nurse is not immediately available, the nurse is trained to locate the charge nurse and get single-cell clearance. Classification officers must receive affirmative medical clearance before making such a transfer. This procedure is not codified as a written policy but rather is communicated to staff through on-the-job training. Though Ernest and Cox were both aware of this policy (despite disagreement as to whether written or verbal clearance was required), Bolton was not familiar with the policy, referring to it not as a policy but rather as a communication between Ernst and his classification subordinates in an attempt "to mitigate risk."

Cox understood the procedure as requiring verbal clearance. He also stated that he believed because of Charles' recent suicide attempt—which he knew about at the time of Charles' placement in solitary—moving Charles to a solitary cell could "harbor a risk" of suicide, but that despite this "gut reaction" counseling against moving Charles into solitary, (1) Cox was not the one qualified to make that decision, and (2) his opposition "wouldn't have changed [Charles'] placement." He did note, however, that if he had said "Hey, I think this guy's going to commit suicide," that mental health would have performed another evaluation

---

[6]Stephanie describes six suicides within the two years preceding Charles' suicide, all in barred solitary cells. After the fifth suicide, Correct Care Solutions provided an environmental recommendation regarding the bars in solitary cells. The report noted that the "bars present an easily accessible opportunity for self-harm. It is recommended that the necessity of these bars be evaluated or an alternative safety implement for windows be considered." Dr. Smith signed off on this report. A few months later, a sixth inmate hanged himself in a barred solitary cell on October 4, 2015, the month before Charles' suicide.

In addition to the clearance required before removal to solitary, LMDC had another purported policy in which certain inmates with a history of suicide attempts received a "no bars" alert. Whereas before medical staff made the no-bars determination, LMDC shifted to using a committee that met weekly to decide whether an inmate merited a no-bars alert. This "no-bar" alert procedure was available at the time that Charles was released from observation into general population. It is unclear why Charles received no such alert.

before moving Charles. Smith later testified that if she had received such a call, she "would [have] recommend[ed] Charles not be placed in a single cell" based on his recent suicide attempt. Another nurse supervisor testified that he would have recommended Charles be placed in a cell with no bars because of concern a barred cell presents "ligature points" and that "[t]hey were not supposed to move him until they heard back from medical."[7] Cox himself agreed that placing an inmate with a bedsheet in a barred solitary cell presented an opportunity for a suicidal inmate to commit suicide.

Despite noting that he was waiting to hear back from medical, Cox did not wait. Cox moved Charles to a solitary cell with bars. Less than two hours after his move to that solitary cell, Charles hanged himself. At 10:47 P.M. on November 24, an officer found Charles hanging from a bedsheet tied to the bars in his cell. Jail staff immediately began CPR and transported Charles to the University of Louisville Hospital. Charles never regained brain function, and on November 28, 2015, his family took him off life support.

### D. Procedural History

Stephanie Troutman, as personal representative of Charles Troutman's estate, initially brought suit against several defendants, including: Louisville Metro Department of Corrections, Louisville/Jefferson County Metro Government, Mark Bolton, seven correction officers, Correct Care Solutions, four Correct Care Solutions nurses, and several John and Jane Does. Troutman asserted claims under 42 U.S.C § 1983 against the officers, the Department of Corrections, and the municipality for deliberate indifference and failure to train. Troutman also asserted wrongful death and gross negligence claims under Kentucky state law. After several amended complaints and extended discovery, she voluntarily dismissed most of those defendants. Later, Stephanie settled with Brown, Smith, and Correct Care Solutions.

Subsequently, Defendants Bolton, Cox, and Louisville-Jefferson County Metro Government moved for summary judgment, and to exclude portions of the expert testimony of Dr. Glindmeyer. On March 3, 2020, the district court granted that motion for summary judgment

---

[7]That nurse, Nurse Schindler, also testified that if Charles were in a solitary cell, he would have placed a "watcher" with Charles.

for all defendants on all counts.  The district court dismissed Stephanie's § 1983 claims with prejudice, declined to exercise supplemental jurisdiction over the remaining state-law claims (thereby dismissing them without prejudice), and denied the motion to exclude as moot.  The district court found that Cox was not subjectively aware of Charles' suicide risk, that Bolton had not "completely abdicated" his responsibilities, and that Stephanie showed no direct causal connection between Louisville Metro's policies and customs and her father's constitutional injury.  On that same day, the district court entered a final judgment in favor of Defendants Cox, Bolton, and Louisville-Jefferson County Metro Government.  On March 16, 2020, Stephanie filed her timely notice of appeal.

## II.  ANALYSIS

### A.  Standard of Review

"We review the district court's grant of summary judgment de novo."  *Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 835 (6th Cir. 2012) (citing *Blackmore v. Kalamazoo County.*, 390 F.3d 890, 894 (6th Cir 2004)).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A "[d]efendant bears the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Plaintiff's claims."  *Romans*, 668 F.3d at 835 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  A genuine dispute exists when a plaintiff presents "sufficient evidence from which a jury could reasonably find in [her] favor."  *Id.*  (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  When reviewing a grant of summary judgment in favor of the defendant, we draw all reasonable inferences in favor of the plaintiff.  *Id.*  (citing *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008)).  In so doing, we must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *In re Calumet Farm, Inc.*, 398 F.3d 555, 558-59 (6th Cir. 2005) (quoting *Liberty Lobby*, 477 U.S. at 251-52).

We review the district court's analysis of state law de novo. *Rawe v. Liberty Mut. Fire Ins. Co.,* 462 F.3d 521, 526 (6th Cir. 2006) (citing *Salve Regina Coll. v. Russell,* 499 U.S. 225, 231, (1991)).

**B. Section 1983 Claim for Deliberate Indifference to Serious Medical Needs**

Troutman asserts claims under 42 U.S.C. § 1983 against Cox and Bolton for deliberate indifference to Charles' serious medical needs, and against the Louisville Metro Government on its policies and procedures which allegedly were the "moving force" behind the denial of adequate medical care for her father. To bring a claim under § 1983, a plaintiff must "identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)).

Though the basis for this claim for convicted prisoners arises under the Eighth Amendment's prohibition of cruel and unusual punishment, *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976), for pretrial detainees like Charles, "this right to adequate medical treatment attaches through the Due Process Clause of the Fourteenth Amendment, which affords pretrial detainees rights 'analogous' to those of prisoners." *Linden v. Washtenaw County*, 167 F. App'x 410, 415 (6th Cir. 2006) (quoting *Watkins*, 273 F.3d at 685-86). A prison official violates that right to adequate medical treatment when he or she acts with "deliberate indifference" to a pretrial detainee's "serious medical needs." *Estelle*, 429 U.S. at 104; *see also Perez v. Oakland Cty.*, 466 F.3d 416, 423 (6th Cir. 2006). Psychological needs may constitute such "serious medical needs" particularly when those psychological needs "result in suicidal tendencies." *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994). Inmates do not have a guaranteed Eighth Amendment right "to be screened correctly for suicidal tendencies," however, "prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001); *Perez*, 466 F.3d at 423.

Under our traditional analysis, the deliberate indifference standard at issue has both an objective and subjective component. *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 600

(6th Cir. 2020).**[8]** Under the objective standard, a pretrial detainee must show an objectively "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To show that the medical need was sufficiently serious, the plaintiff must show that the conditions of incarceration imposed a "substantial risk of serious harm." *See Miller v. Calhoun County*, 408 F. 3d 803, 812 (6th Cir. 2005) (internal citations omitted). An inmate's "psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Comstock*, 273 F.3d at 703 (citing *Horn*, 22 F.3d at 660). A plaintiff meets the objective prong of the Eighth Amendment analysis by showing that the inmate showed suicidal tendencies during the period of detention or that he "posed a strong likelihood of another suicide attempt." *Perez*, 466 F.3d at 424; *Linden*, 167 F. App'x. at 416.

Under the subjective standard, "an inmate must show both that an official knew of her serious medical need and that, despite this knowledge, the official disregarded or responded unreasonably to that need." *Downard*, 968 F.3d at 600 (citing *Comstock*, 273 F.3d at 703). Under this standard, a plaintiff "must show both that a prison official 'subjectively perceived facts from which to infer substantial risk to the prisoner' and that he 'did in fact draw the inference'" but disregarded that risk. *Id.* (citing *Comstock*, 273 F.3d at 703); *see also Farmer*, 511 U.S. at 834. The failure to alleviate a significant risk that an officer "should have perceived but did not" is insufficient for a claim of deliberate indifference, *id.* at 838, but such subjective knowledge may be inferred from the fact that a pretrial detainee's "substantial risk" of harm was "obvious." *Id.* at 842.

For prison suicide cases, the subjective standard requires that it was "obvious that there was a 'strong likelihood' that an inmate would attempt suicide." *Downard*, 968 F.3d at 600 (quoting *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)). It is insufficient to show that an official "acted with deliberate indifference to some *possibility* of suicide, or even a *likelihood* of suicide." *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013) (emphasis in original). This distinction is critical "because a finding of deliberate indifference

---

**[8]**Plaintiffs and their amici assert that we should adopt the standard used by the Second, Seventh, and Ninth Circuits which applies *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) to claims of inadequate medical treatment claims raised by pretrial detainees. This case does not present the opportunity to do so, though the question remains open whether *Kingsley* applies beyond excessive-force claims.

requires a sufficiently culpable state of mind, which the Supreme Court has equated with criminal recklessness." *Id.* (citing *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003)). The official's "state of mind must evince 'deliberateness tantamount to intent to punish.'" *Miller*, 408 F.3d at 813 (quoting *Horn*, 22 F.3d at 660).

Knowledge of the "strong likelihood" of suicide is a "question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Demonstrating such knowledge is a "high bar" and typically requires evidence that the inmate was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm. *Downard*, 968 F.3d at 601 (citing *Grabow v. County of Macomb*, 580 F. App'x 300, 309 (6th Cir. 2014) (collecting cases)). Despondency after an arrest, even if coupled with other stressors like drug withdrawal, does not itself lead to a "strong likelihood" of suicide, at least if the inmate expressly denies feeling suicidal. *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992); *Baker-Schneider v. Napoleon*, 769 F. App'x 189, 193-94 (6th Cir. 2019); *Nallani v. Wayne County*, 665 F. App'x 498, 507-08 (6th Cir. 2016) (holding that inmate did not present a "strong likelihood" of suicide because he denied feeling suicidal, despite indicating previous suicidal thoughts and a history of self-harm).

i. *Defendant Cox*

Stephanie alleges that the district court erred in granting summary judgment in favor of Cox because there are genuine disputes of material fact regarding (1) whether Cox reasonably relied on the opinions of medical personnel and (2) whether Cox had subjective knowledge that Charles was at risk of committing suicide. In response, Cox asserts that he did not believe Charles was suicidal because a nurse previously cleared him from suicide risk. As such, Cox argues that his reliance on a "presumably competent medical authority" absolves him from liability for deliberate indifference. In addition to that reliance, Cox asserts that he observed "no additional signs of suicidal ideation or behavior" following Charles' clearance to general population.

We first consider the objective component of the deliberate indifference standard. A plaintiff meets the objective component by showing that the pretrial detainee exhibited suicidal tendencies during his or her detention or that the detainee "posed a strong likelihood of another suicide attempt." *Perez*, 466 F.3d at 424; *Linden*, 167 F. App'x at 416. When considering the objective component in *Perez*, we remarked that "past threats or attempts at suicide are considered when determining whether an individual is suicidal" even though such past attempts do not necessarily mean the detainee will do so again. *Perez*, 466 F.3d at 425. There, we held that there was a question of fact regarding whether the decedent posed a strong likelihood of another suicide attempt, even where the decedent "gave no indication of suicidal intention during his final evaluation" and in fact denied any such suicidal intention. *Id.*

Here, Stephanie meets the objective component insofar as her father "exhibited suicidal tendencies" during his detention. Charles first attempted suicide on November 14. Such an attempt itself exhibits suicidal tendencies sufficient to meet the objective component. *See, e.g.*, *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). Even though that past attempt did not necessarily demonstrate that Charles would re-attempt suicide, we have previously held that a prior attempt alone is sufficient to raise a dispute as to the objective component. *Perez*, 466 F.3d at 425. In addition to the attempt, Charles exhibited numerous other suicide risk factors according to the factors set forth by Defendants' own witness, Dr. Smith. In addition to a prior suicide attempt, Dr. Smith testified that other suicide risk factors include: (1) a history of alcohol and substance abuse, (2) feeling of hopelessness, (3) impulsive or aggressive tendencies, (4) isolation,[9] (5) access to methods for suicide, (6) a history of mental illness, particularly clinical depression, and (7) prior traumatic brain injuries.

---

[9]The Supreme Court, as far back as 1890, has "expressed concern about the mental anguish caused by solitary confinement." *Apodaca v. Raemisch*, 139 S. Ct. 5, 6 (2018) (Sotomayor, J., writing respecting the denial of writ of certiorari) (citing *In re Medley*, 134 U.S. 160 (1890)). In *Medley*, the Supreme Court wrote that "experience demonstrated that there were serious objections to [solitary confinement]. A considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide, while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." *In re Medley*, 134 U.S. at 168; *see also Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring) (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325 (2006) (describing side effects of solitary confinement as anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors)). One study found that "[i]nmates punished by solitary confinement were

Charles exhibited each of these suicide risk factors: (1) he showed a history of drug abuse, including use up to the day of his imprisonment;  (2) in interactions with staff and telephone calls with Stephanie, Charles repeatedly showed hopelessness at his pending charges and possible prison time, and the intake nurse specifically noted Charles showed such signs; (3) he showed impulsive or aggressive tendencies in two disciplinary infractions in only a few days, one verbal and one physical altercation;[10] (4) he was isolated when placed in solitary confinement on November 24; (5) he had access to the means to commit suicide by his placement in a barred cell with bedsheets; (6) the intake nurse noted Charles exhibited signs of depression and shame; and (7) Charles had a previous traumatic brain injury.  Given Charles' recent suicide attempt and the litany of suicide risk factors present in the summary judgment record, that record reveals a genuine dispute of material fact regarding whether Charles exhibited a "serious medical need" insofar as there was a "strong likelihood" that he would attempt suicide.  *Downard*, 968 F.3d at 600.

Considering next the subjective component, we have previously held that a plaintiff demonstrated deliberate indifference sufficient to overcome a motion for summary judgment when "a prison official moved an inmate from suicide watch even though the official knew the inmate threatened and attempted suicide on several occasions within the same month in jail and had previously been placed on behavior and suicide watches during multiple prior incarcerations at the same jail." *Grabow*, 580 F. App'x at 308–09 (citing *Perez*, 466 F.3d at 424-26).  In *Perez*, the official decided to move the detainee into single-cell housing without first requesting a medical judgment from the jail doctor as to whether that placement was appropriate for the inmate, particularly where the official knew of prior suicide attempts.  *Perez*, 466 F.3d at 425.  In addition to his prior suicide attempts, the official also knew that the detainee was refusing to take his medication and "was experiencing problems getting along with other inmates."  *Id.*  We noted that the evidence was not *conclusive* as to the subjective deliberate indifference—

---

approximately 6.9 times as likely [as those in general population] to commit acts of self-harm" after controlling for length of jail stay.  Tatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 AM. J. PUB. HEALTH 442, 445 (2014).

[10]To the extent a suicide attempt is an act of impulsivity or aggression, Charles also reported to the intake nurse of previous suicide attempts that very year.

particularly where the detainee explicitly expressed no suicidal ideation—but held that the evidence nonetheless raised a genuine issue of material fact whether the official "demonstrated deliberate indifference by disregarding a risk of known serious harm to [the detainee] by making housing decisions for him without consulting a medical professional." *Id.* at 426.

The facts here are similar; a reasonable jury could find that Cox was subjectively aware of the substantial risk to Charles. Cox knew of Charles' suicide attempt in booking. Cox knew that placing Charles in solitary confinement "harbor[ed] a risk" given Charles' prior suicide attempt. Cox knew that barred solitary cells presented a risk of suicide to the extent they provided detainees with means of suicide. Cox knew that he at least needed to get verbal clearance from medical before placing Troutman in a single barred cell. Indeed, in XJail, Cox wrote "INMATE MOVED TO H5D9 PENDING DISCIPLINARY. NOTIFIED NURSE BROWN OF SINGLE CELL USE AND WAITING TO HERE [*sic*] BACK FROM MEDICAL ON THAT." Yet despite that knowledge, and despite his own statement that he was waiting to hear back from medical, Cox did not wait to receive confirmation—written or verbal—from medical allowing Cox to place Charles in a barred single cell. Instead, Cox disregarded his knowledge of the serious risk and placed Charles in a single, barred cell where Charles took his life. Cox's failure to follow the jail policy of waiting to receive clearance from medical may itself be considered as circumstantial evidence of Cox's subjective knowledge. *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 407 (6th Cir. 2015).[11]

Taken together, these facts raise a genuine dispute as to whether Cox knew or understood there to be a "strong likelihood" that Charles would commit suicide if placed in solitary confinement. *Downard*, 968 F.3d at 600 (describing the "strong likelihood" standard and noting that evidence of a previous suicide attempt may suffice to show subjective knowledge).[12]

---

[11]To satisfy the clearance policy, an officer must "contact medical, medical has to contact [the officer] back and say this inmate is cleared for a single cell." There is no dispute that in this case, medical did not contact Cox back before Cox moved Charles to the single cell.

[12]The district court distinguishes this case from *Linden*, in which we found that a reasonable jury could have found the defendant officer deliberately indifferent given the "numerous inconsistent and improbable elements within [the officer's] testimony and his intimate involvement with the events culminating in [the decedent's] suicide." *Linden*, 167 F. App'x at 424. The district court contrasted Cox's involvement here, explaining that, unlike the defendant officer in *Linden*, Cox was only "peripherally involved in Charles's case as a classification officer, moving Charles throughout the jail complex." The relevant defendant in *Linden*, however, was himself also a

This evidence—Cox's knowledge of the risks and disregard thereof—raises a genuine issue of material fact as to whether he demonstrated deliberate indifference by placing Charles in solitary confinement without hearing back from medical. *Perez*, 466 F.3d at 426. This, of course, is not conclusive evidence of deliberate indifference; rather "the evidence presents a sufficient disagreement to require submission to a jury . . . ." *Calumet Farm*, 398 F.3d at 558-59.

We note that Cox's reliance argument—that he reasonably relied on the medical judgment that Charles no longer presented a suicide risk—does not make summary judgment appropriate. In *Perez*, the prison official proffered a similar argument—asserting that the official relied on a doctor's assessment that the detainee was not suicidal—but we found that such reliance was ineffective when the doctor made the assessment ten days prior to the official's decision to move the inmate. *Perez*, 466 F.3d at 425. We also noted that "the situation did not remain stable between" the date of the doctor's assessment and the date the jail official moved the detainee to a single cell, considering that the detainee refused to take medication and began experiencing problems with other inmates. *Id.*

The same is true here. The situation did not remain stable between Charles' initial clearance from medical on November 17 and his suicide on November 24. For one, Charles, like the detainee in *Perez*, was "experiencing problems getting along with other inmates" in that he was involved in two separate altercations, the final of which merited his removal to isolation. *Id.* Further, Charles was cleared "from detox and for GP," i.e., general population. Medical clearance to return Charles to *general* population is not the same as medical clearance to place Charles—who recently attempted suicide—in *solitary confinement* with access to bedsheets and barred windows. A jury may find that such clearance "for GP" does not shelter Cox from a claim that he was deliberately indifferent in moving Chares to solitary.[13] Indeed, Cox's own

---

classification officer. *Id.* at 423. The officer there knew of the decedent's suicidal tendencies (as did Cox, who was present for the suicide attempt and input that attempt into XJail), and the officer there nonetheless moved the decedent into maximum security after the decedent had an altercation with another inmate (as did Cox, who moved Charles to solitary confinement after an altercation with another inmate). *Id.* We see no reason to hold, at this point, that Cox's involvement with Charles was any less "intimate" than was the defendant officer's involvement with the decedent in *Linden*.

[13]Defendants assert that Cox "relied upon the medical assessment that [Charles] could be transferred to a single cell." Nowhere in the record can we find any such clearance to a single cell.

actions before moving Charles to solitary contradict his argument that he relied on a previous medical assessment that Charles was free for placement anywhere in the jail. Cox himself noted in jail records that he was waiting to hear back from medical to move Charles to a single barred cell.

On appeal Cox argues that he relied on the initial medical clearance, but jail records (and his deposition testimony) reveal that he himself was waiting on a *new* assessment from medical regarding Charles' placement in solitary. If Charles were relying on a previous medical assessment, he would have no need to wait on a new one. Like the testimony of the defendant classification officer in *Linden*, 167 F. App'x at 424, such inconsistent testimony at minimum raises a genuine dispute as to whether Charles' reliance was reasonable such that he did not "disregard" a known serious medical risk. The evidence regarding Cox's subjective awareness is not "so one-sided" that Cox must prevail as a matter of law. *Calumet Farm*, 389 F.3d at 558-59. Accordingly, we reverse the district court's granting summary judgment in favor of Cox.

ii. *Defendant Bolton*

Stephanie next argues that the district court erred in granting summary judgment in favor of Defendant Bolton, the jail warden. Though Bolton was not involved in the events leading up to Charles' suicide, Stephanie asserts that Bolton abandoned the duties of his position, in the face of actual knowledge of the risk of suicide by "fail[ing] to establish policies that would protect inmates at risk of suicide from harm, [fail]ing to train and supervise his staff on how to protect inmates at risk of suicide from harm, and fail[ing] to act on the recommendation that would have effectively mitigated the risk posed by the single barred isolation cells." Defendants respond that Bolton cannot be found deliberately indifferent because there is no allegation that he "completely abdicated" any of his responsibilities but rather merely allegations that he inadequately took steps to mitigate the risk of detainee suicide.

A supervisor may not be found liable under 42 U.S.C. § 1983 based on a *respondeat superior* theory. *Winkler v. Madison County*, 893 F.3d 877, 898 (6th Cir. 2018) (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). A supervisor may, however, be liable if he or she "abandon[s] the specific duties of [his or her] position . . . in the face of actual knowledge of a

breakdown in the proper workings of the department." *Id.* (citing *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)). The supervisor must have abdicated his or her job responsibility, and the "*active performance* of the [supervisor's] individual job function" must have directly resulted in the constitutional injury. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (emphasis in original). At minimum a plaintiff "must show that a supervisory official at least implicitly authorized, approved[,] or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy*, 729 F.3d at 421. The supervisor need not have known of the substantial risk to the injured party but rather must have possessed knowledge of potential danger to a particular class of persons. *Taylor*, 69 F.3d at 81.

Two cases highlight the extent to which the supervisor must have been personally responsible for the constitutional injury for § 1983 liability to apply. In *Taylor*, the warden was personally responsible for transferring all prisoners, but he (1) was aware that "his direct designees were redelegating his authority over transfers to lower echelon prison staff without any explicit authorization to do so," (2) was unsure of his own transfer procedures, and (3) "had no review procedures to determine whether his authority was being abused." *Id.* at 80. Given those factors, "a reasonable jury could conclude that [the warden's] own testimony indicates that the operating procedures in reviewing and authorizing transfers were defective and that [the warden] was aware of his subordinates' failure to review prison files before authorizing a transfer." *Id.* In other words, the warden actively abandoned his specific duties in the face of actual knowledge that his department was not properly working, and this abandonment directly led to the harm at issue. *See Winkler*, 893 F.3d at 898. In another case in which we held a supervisor liable under § 1983, the supervisor defendant personally ignored the inmate's complaint that he was not receiving his tuberculosis medicine. *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992). Moreover, the defendant had previously referred other inmates' complaints to the head nurse despite knowing that the nurse was "wrongly altering and destroying some of the inmates' prescriptions." *Id.* We therefore found that the defendant "*personally* had a job to do, and he did not do it," thus violating the plaintiff's Eight Amendment rights. *Id.* (emphasis in original).

Stephanie does not claim that Bolton encouraged a specific incident of misconduct, directly participated in that misconduct, or abandoned the specific positions of his duty in the

fact of actual knowledge of a breakdown in the proper workings of the jail. *Bellamy*, 729 F.2d at 421; *Taylor*, 69 F.3d at 81. Rather, Stephanie claims that Bolton inadequately performed his responsibilities—for instance, by failing to put in writing the policy of requiring medical clearance before transfer to solitary—but such allegations of inadequate performance fall short of the requirements to impose supervisory liability. *Winkler*, 893 F.3d at 899 (distinguishing allegations of inadequate performance from complete abdication of responsibility). Indeed, there was a standing "no bars" policy in place that medical would place on an inmate's XJail if medical determined the inmate was a suicide risk. Even if we are to assume a "breakdown in the proper workings" of this policy—which is plausible, considering the suicide at issue here—Stephanie does not allege that Bolton *knew* the policy was not working and nonetheless completely abdicated his responsibilities. She has not shown that Bolton "either encouraged the specific incident of misconduct or in some other way directly participated in it" nor has she shown that Bolton "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982); *see also Nallani*, 665 F. App'x at 512. Rather, Stephanie claims that Bolton inadequately performed his duties, but such claims are insufficient for § 1983 supervisory liability. *Winkler*, 893 F.3d at 899.

Accordingly, we affirm the district court's grant of summary judgment in favor of Defendant Bolton.

### iii. *Louisville Metro Government*

Finally, Stephanie seeks to hold the Louisville Metro Government liable because its "policies and procedures were the moving force behind the denial of adequate medical care to Mr. Troutman." She argues first that Bolton, as an official with final decision-making authority, failed to ensure that LMDC operated with adequate policies, training, and supervision, and that he failed to adopt a recommendation that he make bars inaccessible in solitary cells. She also argues that Louisville Metro Government is liable based on a custom of inaction insofar as the pattern of suicides put the municipality on notice that the failure to correct the problem would place future inmates at risk of harm. Finally, she argues that inadequate policies, training, and supervision were the "moving force" behind Charles' suicide.

A municipality "cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Rather, a municipality may be liable under § 1983 "only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell*, 436 U.S. at 694). Such liability "must rest on a direct causal connection between the policies or customs of the city and the constitutional injury to the plaintiff; '[r]espondeat superior or vicarious liability will not attach under § 1983.'" *Gray*, 399 F.3d at 617 (quoting *Canton*, 489 U.S. at 385). A municipality may be liable under an inadequate training theory "where the risks from its decision not to train its officers were 'so obvious' as to constitute deliberate indifference to the rights of its citizens." *Id.* at 618. In the prison suicide context, our "case law imposes a duty on the part of municipalities to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable. Where such a risk is clear, the municipality has a duty to take reasonable steps to prevent the suicide." *Id.*

However, "[v]ery few cases have upheld municipal liability for the suicide of a pre-trial detainee," *id.*, and our cases clearly distinguish between deliberate indifference and negligence. *Id.* at n.1 ("Deliberate indifference remains distinct from mere negligence. Where a city does create reasonable policies but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability."); *see also Molton v. City of Cleveland*, 839 F.2d 240, 247 (6th Cir. 1988). In *Molton*, we held a municipality could not be held liable where there was no showing that the municipality's policymakers—as opposed to the individual officers directly involved in the inmate's suicide—ignored a known or apparent risk; while those policymakers may have been negligent, "[n]egligence does not establish a § 1983 claim." *Molton*, 839 F.3d at 246-47 (citing *Estelle*, 429 U.S. at 105-06).

If the plaintiff fails to establish a constitutional violation by any individual officer, the municipality itself cannot be held liable under § 1983. *Watkins*, 273 F.3d at 687. That is to say, "where there exists no constitutional violation for failure to take special precautions to prevent suicide, then there can be no constitutional violation on the part of a local government unit based on its failure to promulgate policies and to better train personnel to detect and deter jail

suicides." *Crocker ex rel. Est. of Tarzwell v. County of Macomb*, 119 F. App'x 718, 724 (6th Cir. 2005) (citing *Barber*, 953 F.2d at 240). Therefore, liability must rest, if at all, on the actions of Cox in the context of the municipality's policy, since we find that only Cox disputably violated Charles' constitutional rights. *See Perez*, 466 F.3d at 431.

We agree with the district court in granting summary judgment in favor of the Louisville Metro Government. Stephanie's allegations against the municipality may support the conclusion that it was negligent, but a "finding of negligence does not satisfy the deliberate indifference standard." *Id.* (citing *Gray*, 399 F.3d at 618 n.1; *Molton*, 839 F.2d at 246). Our holding that Cox was arguably deliberately indifferent rests in large part on his *failure* to follow the prison's policy regarding obtaining clearance from medical staff before placing an inmate in solitary confinement. That is to say, underlying our finding of potential liability on Cox is a finding that Cox deliberately ignored jail policy; Stephanie's arguments suggest that if another employee had properly followed the jail's policy, then Charles' suicide could have been prevented. In *Perez*, we found a similar tension between the arguments against an individual officer and against the municipality. *Id.* at 432. There, the plaintiff argued that placing the decedent in a single cell before his suicide "wholly disregarded jail policy" which requires such inmates indicating potentially suicidal behavior be placed in a "multiple cell with appropriate supervision." *Id.* Though we found that the individual officer was arguably deliberately indifferent in his disregard of the risk of moving the decedent into solitary, *see id.* at 425, we found that those same arguments counseled against finding the municipality liable. *Id.* at 432. In other words, the arguments against the individual officer—that he failed to follow jail policy—itself implies the existence of a policy which, if followed adequately, would have prevented the suicide. *See also Linden*, 167 F. App'x at 420 ("It appears Plaintiff cannot decide whether the policies or their execution was at fault.").

Here, the municipality *did* have policies in place. It is plausible that the municipality was negligent in enacting and enforcing those policies, but "[d]eliberate indifference remains distinct from mere negligence. Where a city does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability." *Perez*, 466 F.3d at 430. Stephanie has not shown that "through its deliberate conduct, the municipality was the

'moving force' behind the injury alleged." *Gregory*, 220 F.3d at 442. She has not shown "that the municipal action was taken with the requisite degree of culpability" nor has she demonstrated "a direct causal link between the municipal action and the deprivation of federal rights." *Id.* (citing *Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 405 (1997)). Rather, she points to things that the municipality *could have done* to prevent the suicide, but "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Gray*, 399 F.3d at 619 (quoting *Canton*, 489 U.S. at 392).

Moreover, "[p]retrial detainees do not have a constitutional right for cities to ensure, through supervision and discipline, that every possible measure be taken to prevent their suicidal efforts." *Id.* Though we find that Cox was arguably deliberately indifferent in executing jail policies, such a finding of individual liability cannot—without more—support a finding of municipal liability because a municipality "cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory*, 220 F.3d at 441 (citing *Monell*, 436 U.S. at 694).[14] The facts here are tragic, and we have written before to note the troubling statistics regarding suicides in jail, *see Grabow*, 580 F. App'x at 313 (Donald, J., concurring), but deliberate indifference is a "stringent standard of fault," *Perez*, 466 F.3d at 430, and under that stringent standard, "[v]ery few cases have upheld municipal liability for the suicide of a pre-trial detainee." *Gray*, 399 F.3d at 618. So too here, where the evidence shows that one of the municipality's officers was at least arguably deliberately indifferent but does not show that the "deliberate conduct" of the municipality was *itself* a "moving force" behind the violation of Charles' constitutional rights, nor that there is a "direct causal connection" between the municipality's policies or customs and Charles' constitutional injury. *Gregory*, 220 F.3d at 442; *Gray*, 399 F.3d at 617.

---

[14]To the extent Stephanie seeks to hold the municipality liable on a failure-to-adequately-train theory, such "[i]nadequate training of officers may serve as a basis for liability under § 1983 only where the failure to train amounts to deliberate indifference to the rights of individuals with whom the officers come into contact." *Tarzwell*, 119 F. App'x at 724 (citing *Canton*, 489 U.S. at 388). We reiterate that the facts here support a finding that the municipality was *negligent*—for example, negligent in ensuring sufficient training such that employees like Cox adequately carried out jail policies—but such negligence on the part of the municipality cannot form the basis of § 1983 liability. *Molton*, 839 F.2d at 247.

Accordingly, we affirm the district court's grant of summary judgment in favor of the Louisville Metro Government.

## C. State Law Claims

Finally, Stephanie asserts that the district court erred in declining to exercise supplemental jurisdiction over the state law claims for gross negligence and wrongful death. The district court declined such jurisdiction because it dismissed all of Stephanie's federal claims. Because we have revived some of her federal claims, it is appropriate to reinstate the state-law claims to the extent they are relevant to the remaining federal claims against Cox. *See Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 465 (6th Cir. 2013) (distinguished on other grounds).

## III. CONCLUSION

Because there remains a genuine dispute concerning whether Defendant Cox was deliberately indifferent, we reverse the district court's grant of summary judgment in favor of him, as well as reinstate the state-law claims to the extent they are relevant to Cox. As to Bolton and the Louisville Metro Government, we affirm.