NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0343n.06

No. 21-6044

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Aug 19, 2022
DEBORAH S. HUNT, Clerk

MITCHEL ALBIN,                                  )
    Plaintiff - Appellant,                     )
                                                )
    v.                                         )
                                                )
DR. DAVID SUETHOLZ, et al.,                     )
                                                )
    Defendants,                                )
                                                )
JEFFREY TILLINGHAST, FELICIANO                  )
VELASCO, PATRICK RYDER, CHUCK                   )
HOPPLE, JASON RUSSELL, and JAMES                )
SMITH, in their individual capacities,          )
                                                )
    Defendants - Appellees.                    )
                                                )

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

OPINION

Before: SILER, BUSH, and MURPHY, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Mitchel Albin experienced diabetic ketoacidosis while

incarcerated in Covington, Kentucky at the Kenton County Detention Center (KCDC) for a parole

violation. He sued a litany of jail employees (the KCDC defendants) and third-party medical staff,

alleging that the defendants were deliberately indifferent to his serious medical needs in violation

of his federal constitutional right to protection from cruel and unusual punishment. The district

court granted summary judgment to the KCDC defendants. We affirm.

**I.**

Police in Kenton County arrested Albin for a probation violation in November 2018.

A judge sentenced him to incarceration at KCDC over four consecutive weekends. Albin self-

surrendered for his first weekend of incarceration on November 16. Jail officers booked him in at 1842.[1]

Before entering the jail that night, Albin ate dinner at a local McDonald's. As a diabetic, he checked his blood sugar and took insulin in the jail parking lot. At that time, nothing seemed irregular. Albin alerted jail staff to his diabetes but no other active medical issue. So he was booked and assigned to Dorm 102 in cell block D-2.

Before we continue, a quick detour to go over staffing at the jail that weekend will benefit the analysis later. That evening, Deputy Jeffrey Tillinghast worked in D-2 from 1500 to 2300. Sergeant Jason Russell supervised D-2 from 1500 to 2300, and Sergeant Chuck Hopple supervised D-2 from 2300 until 0700 the next morning. Sergeant James Smith supervised D-2 from 0300 until 1500 on November 17. And Deputy Patrick Ryder worked in D-2 from 0700 until 1057 that morning.[2]

Back in D-2, Albin's troubles began shortly after he entered the cell block. He believes that he began feeling ill around 1900 or 1930. He laid down in his assigned sleeping area, and around 2100 or 2200, he started vomiting. Sometime during the night, his condition worsened: he began vomiting more often and more severely. Albin believed he was experiencing diabetic ketoacidosis, a serious condition which had hospitalized him at least twice before.

The rest of the facts of Albin's stay at KCDC are far from clear. By Albin's "best estimate," he first reported his vomiting to a deputy on duty around 2200 or 2300, but he "can't be for certain on that." He does not recall the name of any deputy he told about his vomiting. Nor is he able to

---

[1] Here, we use military time rather than a standard twelve-hour clock to mark specific events that occurred during Albin's stay at KCDC. Because Albin's recollection is as incomplete and unclear as it is, military time offers the best temporal picture of when the various employees were working and when certain events happened in relation to those times.

[2] Deputy Andrew Hamilton and Deputy Charles Schadler also worked in D-2 during this time, but Albin conceded to the district court that neither acted inappropriately, so they were dismissed from the case.

provide a description of anyone he spoke to that night. He is also unsure how many times he spoke with deputies or what they might have said. For the jail's part, Tillinghast does not recall Albin requesting medical assistance at any point. Nor does Russell. And the Pass Down Logs (PDLs), which detail anything out of the ordinary that occurred during a particular shift, contain no reference to Albin. Albin does, however, "absolutely believe" that someone contacted jail medical staff and admits that the deputies "were probably receptive" to his needs.

Albin may have spoken with Deputy Feliciano Velasco. This is because Velasco covered D-2 from around 0008 to 0023 on November 17 for another deputy. Velasco recalls speaking with Albin about his medical issues and informing Hopple and the medical staff about Albin's situation. Velasco then returned to his usual shift outside of D-2. Hopple does not recall this conversation but does not deny its occurrence.

Albin admits that "at some point [he] was seen" by a nurse with a cart who came around to his cell. But he remains unsure whether he was seen "an hour into the vomiting or 12 hours into the vomiting." And he does not know whether he was seen before or after lights-out in the cell block that night. An on-duty jail nurse, Michael Vandergraff, stated that he took the medical cart to D-2 partially to assess Albin's condition and that Albin refused such an assessment. For his part, Albin denies refusing medical attention at any point.[3]

Jail medical staff take the blood-sugar readings of diabetic inmates every morning between 0300 and 0500. And inmate tracking logs show that Albin left his cell at 0448 on November 17 to have his blood sugar checked and receive insulin. As noted above, Ryder worked in D-2 from 0700 until 1057 that morning. He does not recall speaking with Albin at any point about Albin's

---

[3] Albin at first sued Vandergraff and the various other medical staff members named here, but he settled with them all below.

medical needs. Nor does he recall noticing Albin vomiting in the cell block. Albin alleges that he refused meals while at KCDC. But neither Deputy Ryder's PDL from the shift nor the inmate food-tracking log reflects a formal refusal.

At 1117 on November 17, officers took Albin to the jail medical unit. He does not recall what happened in the medical unit or how long he was there. He does believe that he returned to his cell and "vomited every 15 minutes" until 1517. Then, another jail nurse, Jessica Razor, visited Albin's cell in response to a report about his nausea. Razor discovered that Albin had high blood sugar, so she consulted Dr. David Suetholz, who instructed Razor to provide Albin with insulin for his blood sugar and Zofran to calm his vomiting.

Razor checked on Albin again at 1841. Albin advised that, while the Zofran had helped his nausea, he was still experiencing significant pain. Consequently, at around 0000 on November 18, Dr. Suetholz requested that Albin be transported to Saint Elizabeth Hospital, where Albin remained hospitalized until November 21.

Albin sued many staff members at KCDC and Southern Health Partners, Inc., asserting under the Eighth and Fourteenth Amendments, a deliberate-indifference claim against them in their individual capacities. KCDC defendants Tillinghast, Hamilton, Schadler, Velasco, Ryder, Hopple, Russell, and Smith moved for summary judgment, which the district court granted. Albin timely appealed.

**II.**

We review summary judgment de novo. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008). Summary judgment should be granted when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And we draw all reasonable

inferences in favor of the nonmovant. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88  (1986).

Qualified immunity protects government officials from liability if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). To determine whether the defendants were entitled to qualified immunity, we perform a two-part inquiry. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). That review considers whether the facts "make out a violation of a constitutional right" and whether the right at issue was "clearly established" when the incident occurred. *Id.*; *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A plaintiff must satisfy both parts of the inquiry to defeat the assertion of qualified immunity. *Sumpter v. Wayne County*, 868 F.3d 473, 480 (6th Cir. 2017).

Albin believes that the defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights as incorporated against the states under the Fourteenth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 834–35 (1994). For the deputies, deliberate indifference can occur when they intentionally deny or delay access to medical care. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Albin, then, must prove that he had a "sufficiently serious medical need" and that the deputies knew of and disregarded a "substantial risk" of serious harm to him. *Miller v. Calhoun County*, 408 F.3d 803, 812–13 (6th Cir. 2005) (cleaned up); *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018).

For the sergeants—who merely supervised the deputies on the ground—the standard is higher. Albin must show that a sergeant "abdicated his or her job responsibility" and that the sergeant's actions directly caused the constitutional violation. *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487 (6th Cir. 2020) (citation omitted). At a minimum, Albin must show

that a sergeant "at least implicitly authorized[,] approved, or knowingly acquiesced in the unconstitutional conduct[.]" *Id*. at 487.

The district court granted summary judgment to the KCDC defendants, and Albin appealed. He argues that the district court erred on both prongs of the qualified immunity analysis. We take each claim in turn.

*Deputy Tillinghast*

First we consider Deputy Tillinghast. Albin claims that Tillinghast was subjectively aware of Albin's medical needs and failed to help him get treatment. The record does not support this claim. Indeed, Albin has not alleged that he spoke with Tillinghast at any point. Nor does Tillinghast recall speaking with Albin or noticing anything unusual about him. On Albin's version of the facts, he began vomiting around 2100 or 2200 but did not report it until more than an hour later. Albin says this is because he did not know why he felt ill. In any event, Tillinghast's shift had almost ended at the earliest possible time Albin may have reported his vomiting. Tillinghast stated that if Albin had approached him needing medical attention, he would have noted Albin's request in the PDL at "the exact time" assistance was requested. But no such entry exists.

On these facts, the district court did not err. The record bears out its conclusion that Tillinghast had no subjective awareness of Albin's needs. *Cf. Horn v. Madison County Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994) ("Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference."). Albin never conveyed his feelings during the intake process. And Albin has alleged nothing suggesting that Tillinghast knew of his issues. Tillinghast is thus entitled to qualified immunity.

*Sergeant Russell*

Next is Sergeant Russell. As with the district court's conclusions about Tillinghast, Albin believes the district court "erred in resolving issues of fact in favor of" Russell. Again, we disagree. The bottom line is that Albin does not allege any interaction between the two during this time. So Albin's main claim requires that Russell be liable as a supervisor for Deputy Tillinghast's actions (or lack thereof). But nothing in the record shows that Tillinghast spoke with Russell about Albin during the shift in question.[4]

The essence of Albin's claim against Russell is supervisory liability. Under 42 U.S.C § 1983, a finding of supervisory liability requires unconstitutional conduct by a subordinate. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006). And as set out above, Albin put forth no facts suggesting that Tillinghast even knew of Albin's medical needs in the first place. So, since Tillinghast's conduct did not violate the Constitution, Russell cannot be liable under this theory either.

*Deputy Velasco*

Moving on to Deputy Velasco, Albin argues once again that the district court "erred in resolving issues of fact in favor of" Velasco. We acknowledge that our analysis here is different from the others. This is because Velasco admits learning of Albin's condition. But even with that said, Albin's argument fails.

Velasco worked in D-2 for a mere fifteen minutes on November 17, starting at 0008. But he recalls that during those fifteen minutes Albin told him that he was "torn up" and vomiting blood. Velasco then states that he informed Hopple and the medical staff of Albin's issue. Albin

---

[4] Sergeant Russell also worked on November 17 and filled out an incident report around 1700 relating to Albin's move to isolation. That said, Albin's allegations relate only to Russell's supervisory role over Tillinghast on November 16. *See* Appellant's Br. at 24.

has not disputed this, noting that he "absolutely believe[s]" that whoever he told of his condition reported it. And he admits that he was eventually seen, which matches jail records.

It is likely that Velasco knew of Albin's serious medical condition. Assuming that Albin used the word "ketoacidosis" as he alleges, a diabetic vomiting blood and mentioning the specific condition he had experienced likely put Velasco on notice that Albin's medical needs required him to act.

Velasco, then, had the responsibility to act. *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). But he did just that. He alerted jail medical staff and his supervisor. And on that basis Albin received care. Albin does not specify what Velasco should have done on top of what he did, presumably because Velasco satisfied his duty. *See Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) (refusing to find liability where a detective sought medical care for an arrestee suffering from diabetic ketoacidosis). Velasco did not disregard Albin's needs, so he did not violate the Constitution either.

*Sergeant Hopple*

Next up is Sergeant Hopple. Albin believes that Hopple should not receive qualified immunity because Albin "was not seen by medical at all" once Hopple learned of Albin's condition. Once again, we disagree. This argument is particularly unavailing because of the above-stated facts. To repeat, Albin himself does not allege that he was not seen by jail medical staff. By contrast, he admits that he *was* seen. He even states that deputies "were probably receptive" to his needs.

True enough, there is a slight inconsistency between Velasco's and Hopple's depositions. Velasco believes that he told Hopple of Albin's issues and that Hopple responded in person to Velasco's report. Hopple does not specifically recall this. But when asked, he could not say for

certain. At any rate, the undisputed facts show that Albin received assistance. If Hopple knew of Albin's issues, his actions pass muster: the medical staff visited Albin. If he did not know, then he cannot have known that Albin needed care in the first place and thus cannot be liable under Albin's theory. Either way, Hopple's conduct does not prove that he failed to act when faced with a situation that required him to do so. *Cf. Garretson*, 407 F.3d at 797.

*Deputy Ryder*

Our last deputy is Deputy Ryder, who worked cell block D-2 from 0700 to 1057 on November 17. Albin believes that the district court erred in refusing to take Ryder's statement that he "does not recall" being alerted to Albin's vomiting as sufficient to allege that he *was* alerted to it. And he believes that the district court's use of *Watkins* was inapt. See 273 F.3d at 686. We disagree.

Albin's and Ryder's depositions differ about whether Albin formally refused his meals on November 17. Albin maintains that he refused all meals. And this, he believes, should have been a red flag for the jail staff. Ryder states that he does not recall Albin skipping a meal and that he would have noted any refusal in his daily log; no such entry exists. Taking Albin's versions of the facts as we must, Albin's skipping of a meal does not by itself mean that Ryder *knew* that Albin had serious medical needs.

Once again, Albin has alleged no facts specific to the deputy at hand. Ryder states that he "does not recall" being alerted to Albin's vomiting. Nor does he recall noticing any inmate vomiting during his shift. But for his part, Albin has shown no evidence that Ryder knew of his vomiting or noticed any abnormal conduct. Recall that Albin cannot identify or describe a single deputy he spoke to during his time at KCDC. And as we have repeatedly held, "mere speculation" is not enough. *See Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004).

As to Albin's other claim, the district court did not err in comparing Albin's case to *Watkins*. Albin disagrees, noting that the defendant in *Watkins* did not want treatment, but Albin did. True enough, but Albin's contention that a reasonable juror could find that Ryder knew of Albin's condition and "made no attempt to procure medical attention" is not persuasive. Nothing in the record suggests any interaction between Albin and Ryder or any knowledge of Albin on Ryder's end. The district court did not cite *Watkins* for its facts; it cited *Watkins* to show that mere speculation is not enough. And that is correct. *See Lewis*, 355 F.3d at 533. Ryder's conduct did not violate the Constitution either.

*Sergeant Smith*

Our last Sergeant (and defendant) is Sergeant Smith. Albin makes the same claims he made against Sergeant Russell against our final defendant here. And they fail once again.

Neither Albin nor Smith alleges any interaction between the two on November 17. Nor does Smith recall being informed of Albin's issues by any jail employee. Like his earlier claims, Albin's claims against Smith must prove unconstitutional conduct by a subordinate to impose supervisor liability. *McQueen*, 433 F.3d at 470. He has not.

*Other Claims*

Albin raises two other points of error. First, he claims that the district court erred by accepting defendants' argument that they relied on the medical professionals. This error occurred, he argues, because no one requested help for him until 1517 on November 17. But both the record and Albin's own deposition refute this argument. Albin is correct that medical staff spoke with Albin during their usual rounds—but such is the purpose of those rounds. And the rounds are a sign of a functioning system, not a dysfunctional one. Jail records show that medical staff visited Albin at 1117, four hours before visiting him again at 1517. Albin even suggested that he may

10

have been seen *before* 1117.  If Albin would require untrained jail staff to intervene and attempt to overrule the medical staff in between those visits, we reject that argument.

Albin's final claim is that the law was clearly established at the time of his incarceration that the KCDC defendants' conduct violated the Constitution.  In support, he cites *Garretson* and *Naphier v. County of Genesee*, 2012 WL 6652945 (E.D. Mich. Dec. 21, 2012), which relied on *Garretson*.  These cases, he contends, show an unreasonable delay between the onset of his symptoms on November 16 and when jail staff treated him on November 17.  But that is not the whole story.

In *Naphier*, the officer knew of the plaintiff's medical needs and disregarded them.  As we have explained, Albin has not shown that any individual officer or supervisor at the jail knew of his needs.  And he received treatment before 1517 on November 17, despite his brief's misleading contentions to the contrary.  Neither *Naphier* nor *Garretson* shows a constitutional violation by the KCDC defendants or that the law was clearly established on the matter at the time of his incarceration.

## III.

Albin has not shown that any KCDC defendant besides Velasco knew of his needs.  And Velasco responded appropriately.  Albin's other claims are unavailing.  We affirm.